523 A.2d 379

William J. FOLEY

v.

**CLARK EQUIPMENT COMPANY and Industrial Lift Truck Company and Truckmen, Inc. (Two Cases)**

**Appeal of INDUSTRIAL LIFT TRUCK COMPANY.**

**Appeal of CLARK EQUIPMENT COMPANY.**

Superior Court of Pennsylvania.

Argued May 6, 1986.

Filed March 25, 1987.

600

Harry A. Short, Jr., Philadelphia, for appellants.

Lawrence A. Katz, Philadelphia, for appellee Indus. Lift Truck Co.

Thomas E. Zenoitis, Philadelphia, for appellee Clark Equipment Co.

Before CIRILLO, President Judge, and WIEAND and OLSZEWSKI, JJ.

WIEAND, Judge:

In this appeal we are called upon to examine the role of negligence concepts in tort cases where strict liability has been asserted because of a product which, allegedly, was defectively designed. Specifically at issue are jury instructions in which the trial court emphasized the importance of purging negligence concepts from the determination of design defectiveness in an action brought under the theory of strict products liability. The trial court charged the jury that the inattention of the plaintiff and the inattention of the operator of a forklift truck could not be considered in determining the cause of a collision between the two because the action was based on an alleged defect in the design of the forklift truck. We conclude that evidence which tended to illuminate the conduct of the plaintiff and the conduct of the forklift operator prior to the accident was indispensable in determining the cause of the accident. Because the jury was precluded from considering evidence relevant for this purpose, a new trial will be granted.

On April 25, 1977, William Foley was struck by a forklift truck while traversing a pedestrian crosswalk at the premises of his employer, National Rolling Mills (National). As a result of the collision, Foley sustained injuries which required the amputation of both legs.

The forklift truck involved in the accident had been designed and manufactured by Clark Equipment Company (Clark) and had been sold by Clark to Industrial Lift Truck Company (Industrial), a distributor of Clark products. Industrial, in turn, had sold the truck to Truckmen, Inc.

(Truckmen), a full service leasing company, which had then leased it to Foley's employer, National Rolling Mills.

The Clark forklift truck was a diesel-powered vehicle with a metal carriage attached to the front for the purpose of lifting and carrying heavy objects. The carriage consisted of a mast, chains, and hydraulic cylinder. The lattice structure of the carriage was such that it partially obstructed the view of the lift operator when the vehicle was operated in the forward mode. The operator could overcome the impairment to visibility created by the frontal structure of the truck by constantly shifting his or her eyes and head to look between the crossmembers of the carriage. It was common practice for forklift drivers at National to employ this technique when operating the trucks in the forward mode.

On the morning of the accident, the subject forklift truck was being operated by Lake Keefer, a National employee, to unload steel coils from delivery trucks which were parked at various lots within the plant. In proceeding from one lot to the next, it became necessary for Keefer to drive the forklift across a walkway. The evidence showed that as he approached the crosswalk, he operated the truck in the forward mode at its top speed of approximately five to six miles per hour. Although Keefer was aware that the roadway and crosswalk were heavily trafficked by pedestrians, he had focused his attention solely to the left by looking through a space in the left side of the truck's frontal structure. Foley had entered the crosswalk from a point to the right of the truck's path of travel. Although Foley was aware that the walkway was frequently traversed by vehicles, as well as by pedestrians, he failed to look for oncoming vehicular traffic before starting to cross. His attention remained fixed on another forklift truck which was situated several yards directly ahead of him. Neither Foley nor Keefer saw or was aware of the presence of the other before they collided.

Foley commenced a product liability action against Clark, Industrial, and Truckmen to recover for injuries he sus-

tained in the accident. The complaint alleged that the defendants were strictly liable under Restatement (Second) of Torts § 402A[1] for selling or leasing the forklift in an unreasonably dangerous condition. More specifically, it was asserted that the forklift truck sold by Clark and Industrial and leased by Truckmen had been designed defectively because it lacked devices which would have alerted Foley to the presence of the truck or alleviated obstructions to the driver's visibility by virtue of the truck's frontal carriage. The truck was also defective, Foley maintained, in that it failed to contain a warning of the dangers attending operation of the truck in the forward mode.

After trial, a jury returned a verdict in the amount of $15,000,000 in favor of Foley and against Clark and Industrial. Foley was later awarded delay damages and the verdict was molded to the amount of $18,008,218.80. Both Clark and Industrial filed post-trial motions for judgment n.o.v. and for a new trial. On February 17, 1982, the trial court, upon motion by Industrial, granted full indemnification in favor of Industrial and against Clark. After filing exceptions to the order of indemnification, Clark settled with the plaintiff for $7,500,000. Clark thereafter withdrew its post-trial motions. On June 27, 1985, the trial court issued an order (1) overruling Industrial's post-trial motions for judgment n.o.v. and for a new trial, (2) dismissing the exceptions filed by Clark to the order of February 17, 1982 which granted indemnification in favor of Industrial, (3) entering judgment in favor of Foley and against Clark and

1. That section provides:
    (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
        (a) the seller is engaged in the business of selling such a product, and
        (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
    (2) The rule stated in Subsection (1) applies although
        (a) the seller has exercised all possible care in the preparation and sale of his product, and
        (b) the user or consumer has not brought the product from or entered into any contractual relation with the seller.

Industrial in the molded amount of $18,008,218.80, and (4) entering judgment of indemnity in favor of Industrial and against Clark. The case now comes before this Court on cross-appeals by Industrial and Clark; Industrial challenges that part of the order of June 27, 1985 which overruled its motions for judgment n.o.v. and new trial, and Clark attacks that portion of the same order dismissing its exceptions to the judgment of indemnity which was entered against it.

## I. *The Denial of Industrial's Motion for Judgment n.o.v.*

Industrial argues that it is entitled to a judgment n.o.v. because (1) as a matter of law, the forklift truck could not be found unreasonably dangerous, (2) the evidence produced by the plaintiff was insufficient to support a finding that the forklift truck was defective, and (3) even if there had been sufficient evidence to support such a finding, the plaintiff failed to prove that any defect in the truck was a proximate cause of the accident. Constrained as we are by a narrow standard of review, we must reject these arguments.

On appeal from the denial of a motion for judgment n.o.v., we must view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict winner. *Maravich v. Aetna Life and Casualty Co.*, 350 Pa.Super. 392, 396, 504 A.2d 896, 898 (1986); *Kearns v. Clark*, 343 Pa.Super. 30, 34–35, 493 A.2d 1358, 1360 (1985). Only evidence supporting the verdict is to be considered; all other evidence must be rejected. *Glass v. Freeman*, 430 Pa. 21, 25, 240 A.2d 825, 827 (1968); *Dambacher v. Mallis*, 336 Pa.Super. 22, 33, 485 A.2d 408, 414 (1984). Judgment n.o.v. should be entered only where no two reasonable minds could differ that, as a matter of law, the party has failed to make out his or her case. *Maravich v. Aetna Life and Casualty Co., supra; Dambacher v. Mallis, supra.*

A claim based upon the theory of strict products liability requires two elements of proof: (1) that the product was defective; and (2) that the defect in the product was a

substantial factor in causing the injury. See: *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 93–94, 337 A.2d 893, 898 (1975) (plurality opinion); *Carrecter v. Colson Equipment Co.*, 346 Pa.Super. 95, 100, 499 A.2d 326, 329 (1985); *Bascelli v. Randy, Inc.*, 339 Pa.Super. 254, 259, 488 A.2d 1110, 1113 (1985); *Burch v. Sears, Roebuck and Co.*, 320 Pa.Super. 444, 450, 467 A.2d 615, 618 (1983). According to the decision of our Supreme Court in *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978), the determination of defectiveness is to be made in two stages. First, the trial court must weigh the relative risks and utility of the product and determine whether, as a matter of social adjustment, the imposition of liability would be justified. *Id.* 480 Pa. at 558, 391 A.2d at 1026. See: *Lobianco v. Property Protection, Inc.*, 292 Pa.Super. 346, 361, 437 A.2d 417, 425 (1981). Only after this judicial determination has been made is the case submitted to the jury to determine whether the facts of the case support the averments of the complaint. *Azzarello v. Black Brothers Co., supra* 480 Pa. at 558, 391 A.2d at 1026. A product may be found defective if it "left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Id.*, 480 Pa. at 559, 391 A.2d at 1027.

In the instant case, evidence of defectiveness was provided by the testimony of plaintiff's expert witness, Stanley Klein. Klein, a mechanical engineer, opined that the forklift truck was unreasonably dangerous because it lacked any one of the following elements: (1) a visual warning device such as a flashing or revolving beacon commonly used on emergency vehicles; (2) a bell, alarm, siren or other audible warning signal; (3) a convex mirror to expand the operator's visibility in front of the truck; (4) devices which would make it more comfortable and convenient to operate the truck in reverse, in which direction visibility was unobstructed, including (a) a driver's seat and controls which, instead of facing forward, would be turned at an angle 45° from the forward position and (b) a rear defroster and rear windshield wipers which also would facilitate operation of

the truck in reverse; and (6) a warning to lift drivers that visibility may be impaired when the truck is operated in the forward mode. It was Klein's opinion, moreover, that these enumerated defects were the actual cause of the accident. In addition to Klein's testimony, Foley offered evidence that other forklift trucks manufactured by Clark had been provided with convex mirrors and 45° angled seats and that a few months after the accident, warning lights and bells of the type proposed by Klein had actually been added to forklift trucks at National. Finally, two employees of National testified that, in their judgment, the trucks leased by National were safer after the addition of these warning devices.

■■■ We perceive no abuse of discretion in the trial court's determination that, as a matter of social adjustment, the imposition of strict liability against the manufacturer and distributor of the forklift truck would be justified. See generally: Annot., *Products Liability: Forklift Trucks*, 95 A.L.R.3d 541 (1979) (collecting cases in which strict liability was imposed against forklift manufacturers). Moreover, viewing the evidence in the light most favorable to Foley, and rejecting all contradictory evidence, it cannot be said as a matter of law that Foley's proofs were insufficient to support the verdict. The evidence adduced by Foley satisfied both elements of proof necessary to establish a prima facie case under the theory of strict products liability and, therefore, Industrial was not entitled to a judgment n.o.v.

## II. *The Denial of Industrial's Motion for a New Trial*

The principal defense asserted by Industrial at trial was that the injuries sustained by Foley had not been caused by any defect in the forklift truck, but rather by the inattention of Foley and Keefer, the lift operator. In this regard, defense counsel sought, over objection, to ask plaintiff's expert witness during cross-examination whether it would be good safety practice for a worker traversing the crosswalk to fix his attention straight ahead. The trial court

overruled the objection, but gave the following cautionary instruction to the jury:

... I will instruct the jury that the plaintiff—there is no question of the plaintiff's negligence or contributory negligence arising in this type of case. I will instruct them very forcefully as to whether he was careful or careless, what he did is irrelevant to the issue in this case. This is not a negligence case, this is a products liability case, and I will instruct you accordingly later.

I am telling you now at this point, however, that whether the plaintiff was careful, whether he looked, whether he heard, or any of those which might go to negligence are not against [sic] in a products liability case.

If you will submit points for charge to me in that regard—but for purposes of continuity, I will overrule that objection, with that cautionary instruction to the jury.

N.T. at 683–684. Later, during direct examination of defense expert, Oswald S. Carliss, defense counsel inquired whether there existed any safety standards which Carliss considered germane to the instant case. Citing to Safety Standards for Powered Industrial Trucks, which had been published by the American Society of Mechanical Engineers, Carliss responded as follows:

On page 44, paragraph 604, under the heading of traveling. There is a subparagraph D, this is directed more to the operator who is in the sphere of the user, "Slow down and sound horn at cross aisles and other locations where vision is obstructed. If the load being carried obstructs forward view, travel with the load trailing." That means behind you.

F says, "Look in the direction of, and keep a clear view of the path of travel."

N.T. at 1898–1899. Although no objection thereto had been raised by plaintiff's counsel, the trial court sua sponte interjected the following admonition to the jury:

THE COURT: Now, members of the jury, I must caution you that's where [defense counsel's prior] objection comes in. We are not concerned with whether or not the operator did that or didn't do that. Whether he was careless or whether he was negligent. The question is whether or not the product was defective when it left the manufacturer.

But because it seems to point directly to what the operator does, whether he was careful or whether he looked or whether he slowed down, it's not for that purpose that this evidence is coming in.

Do you understand that?

(All jurors answer affirmatively.)

N.T. at 1899.

At the conclusion of the trial, defense counsel requested that the jury be instructed that "[i]n determining whether the alleged defective condition was a proximate cause of the accident, you should consider the testimony of the operator, Mr. Keefer, and whether he continued to scan the area ahead of him or whether he concentrated in one area so that his vision of the plaintiff was obscured." N.T. at 2645. The trial court denied this request. Thereafter, the court charged the jury as follows:

You have heard me and counsel say many times, that this is not a negligence case, and that we are not in any way involved in questions of carelessness or negligence or contributory negligence. The crucial difference between strict liability and negligence is that the existence of due care, whether on the part of the manufacturer or the seller-distributor or the lessor, or indeed on the person injured is irrelevant, and that it does not matter. That is why we say that a manufacturer or seller is responsible for all injuries caused, all damages caused by his product if it was defective, even if he has exercised all possible care in the preparation and sale of the product. Therefore, the plaintiff does not have to prove that the manufacturer or the distributor, or the supplier or the lessor was negligent in the manufacturing process or in

the selling process. Likewise, we are not at all concerned with whether or not, for example, either Industrial Lift or Truckmen Incorporated were negligent in failing to install or to recommend the installation of safety devices, or for any other reasons dealing with care or negligence. The questions for Industrial as well as Truckmen, just as for Clark, is whether when the lift truck product left the hands of Truckmen, and when it left the hands of Industrial, was it defective and, therefore, unsafe for its intended use and purpose.

The same rule, I caution you, applies to the plaintiff. There is negligence and there is contributory negligence. There is no question as to whether Mr. Foley was careful or not careful; whether he heard something or did not hear something. He is not prevented or barred from recovery on the basis of whether he was careful or not careful, because negligence is not in the case; it's a strict liability case.

N.T. at 2406–2407.

After concluding its instructions, the trial court invited counsel to state their objections to the charge. Defense counsel reasserted Industrial's position that the jury must be permitted to consider the activities of the plaintiff and the forklift operator in making its determination of liability. Industrial argued that although, as the trial court had instructed, the negligence of these individuals could not serve as a bar to the plaintiff's recovery, consideration of their conduct was nevertheless necessary to assist the jury in determining the legal cause of the accident. This argument was again rejected by the court and no further instructions were given to the jury with respect to this issue.

Industrial contends that it was error for the trial court to instruct the jury that evidence relating to the degree of care exercised by the plaintiff, Foley, and the forklift driver, Keefer, was irrelevant in a strict product liability action and that it could not be considered by them for any purpose. This erroneous instruction affected the outcome of the trial, Industrial argues, because it kept from the jury evidence

which was indispensable to a determination of the cause of the accident. Industrial asserts, therefore, that it is entitled to a new trial on the issue of liability. We agree.

### A.

As we have observed, the cautionary instructions given by the trial court were motivated by its belief that negligence principles inherent in the evaluation of an individual's conduct should have no place in a strict liability action involving the alleged defective design of a product. This view is not novel. It has been suggested by courts and commentators alike since the inception of the concept of strict products liability. See generally: Powers, *The Persistence of Fault in Products Liability*, 61 Tex.L.Rev. 777 (1983). It has found frequent expression in the decisions of the appellate courts of this Commonwealth. See, e.g., *Berkebile v. Brantly Helicopter Corp., supra* 462 Pa. at 94, 96, 337 A.2d at 899, 900; *Dambacher v. Mallis, supra* 336 Pa.Super. at 60, 485 A.2d at 428; *Smialek v. Chrysler Motors Corp.*, 290 Pa.Super. 496, 501, 505, 434 A.2d 1253, 1256, 1258 (1981). Interestingly, however, the justification for purging negligence concepts from the analytical framework used for assessing the liability of manufacturers of dangerously designed products has never been thoroughly examined and explained.

More recently, it has been suggested by a growing number of authorities that, at least in cases where the cause of the plaintiff's injury is attributed to product design, there is no practical difference between theories of negligence and strict liability. See, e.g., *Jonescue v. Jewel Home Shopping Service*, 16 Ill.App.3d 339, 306 N.E.2d 312 (1973); *Jones v. Hutchinson Manufacturing, Inc.*, 502 S.W.2d 66 (Ky.1973); *Prentis v. Yale Manufacturing Co.*, 421 Mich. 670, 365 N.W.2d 176 (1984); *Lancaster Silo & Block Co. v. Northern Propane Gas Co.*, 75 A.D.2d 55, 427 N.Y.S.2d 1009 (1980); *Fowler v. General Electric Co.*, 40 N.C.App. 301, 252 S.E.2d 862 (1979); *Jones v. White Motor Corp.*, 61 Ohio App.2d 162, 401 N.E.2d 223 (1978); *Young v. Reliance*

*Electric Co.*, 584 S.W.2d 663 (Tenn.Ct.App.1979); Senate Committee on Commerce, Science, and Transportation, Product Liability Act, S.Rep. No. 476, 98th Cong., 2d Sess. (1984), *reprinted in* 2A L. Frumer & M. Friedman, *Products Liability* § 16F (rev. ed. 1986); Birnbaum, *Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence*, 33 Vand.L.Rev. 593 (1980); Hoenig, *Product Designs and Strict Tort Liability: Is There a Better Approach?* 8 Sw.U.L.Rev. 109 (1976); W. Kimble & R.O. Lesher, *Products Liability* § 133 (West's Handbook Series 1979); Powers, *supra;* Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L.J. 1099 (1960). The focus under either theory, according to these authorities, is the same—whether the manufacturer's choice of design was reasonable. Thus, the attempt to extricate negligence principles from the doctrine of strict products liability, it is argued, is but a futile exercise in analytical and linguistic gymnastics. See: Birnbaum, *supra* at 601. See generally: Powers, *supra.*

This issue involves more than mere academic debate. It has contributed to the confusion which plagues product liability law in this and other jurisdictions. Perhaps more importantly for our immediate purposes, it has, as we shall see, played a significant role in the litigation of the instant action. It is deserving, therefore, of our careful consideration.

### 1. *Background: The Development of Strict Products Liability*

The law of products liability developed according to changing societal concerns regarding the relationship between manufacturers/sellers of products, on the one hand, and individual consumers on the other hand. *Berkebile v. Brantly Helicopter Corp., supra* 462 Pa. at 93, 337 A.2d at 898. The social attitude which prevailed during the Nineteenth Century favored protection of the nascent manufacturing industry. Consumers who purchased manufactured goods during this era did so at their own risk. However, as the manufacturing industry grew and flourished, and the

products which it produced became more sophisticated and complex, societal concerns for protection shifted from manufacturers to consumers. See: *Azzarello v. Black Brothers Co., supra* 480 Pa. at 553, 391 A.2d at 1023. This transformation in social values was reflected in the law of products liability. The Nineteenth Century principle of caveat emptor was replaced in the Twentieth Century by the notion that it was the consumer who should be protected. *Id.*, 480 Pa. at 553, 391 A.2d at 1023–1024.

By the 1950s and early 1960s, there had developed a school of thought that traditional theories of negligence were inadequate to afford necessary protection to the consumer. See: Birnbaum, *supra* at 595–596. This concern arose from cases in which consumers had been injured by products which contained manufacturing defects. In such cases, the product typically had been marketed in a dangerous condition which deviated from the manufacturer's design specifications because of some error occurring during the manufacturing process. In view of the complexity of modern mass production systems utilized by manufacturers, it was believed, it would be difficult, if not impossible, for the plaintiff to identify at what point along the assembly line the manufacturer had been negligent. See: *Escola v. Coca-Cola Bottling Co.*, 24 Cal.2d 453, 462–64, 466, 150 P.2d 436, 441, 443 (1944) (Traynor, J., concurring). See also: Birnbaum, *supra* at 595–596. Although, in some instances, the plaintiff could rely on the doctrine of res ipsa loquitur to create an inference of negligence, the manufacturer could rebut this inference by demonstrating that it had exercised reasonable care during the manufacturing process and had adopted adequate quality control procedures. *Escola v. Coca-Cola Bottling Co., supra* at 462, 150 P.2d at 441.

The doctrine of strict products liability was devised to alleviate the plaintiff's evidentiary burden in cases involving manufacturing defects. See: Model Uniform Product Liability Act § 104 analysis of that section, 44 Fed.Reg. 62,714, 62,722 (1979); Hoenig, *supra* at 118; Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss.L.J. 825,

830–832 (1973). It was first articulated by Justice Traynor of the Supreme Court of California in his now famous concurring opinion in *Escola v. Coca-Cola Bottling Co.*, *supra*. Noting that the lack of familiarity with the manufacturing process would in most cases prove fatal to an injured consumer's negligence claim, Justice Traynor opined that the manufacturer's negligence should no longer be singled out as the basis for the plaintiff's right to recover. *Id.* at 460–464, 150 P.2d at 440–441. Instead, he suggested, a manufacturer should be held strictly liable in tort when an article which he has placed on the market, knowing it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. *Id.* at 460, 150 P.2d at 440.

The new theory of recovery proposed by Justice Traynor was distinguishable from negligence in that it focused not on the reasonableness of the manufacturer's conduct during the manufacturing process, but rather on the condition of the product itself. Under the doctrine of strict products liability, the plaintiff no longer was required to pinpoint what went wrong during the offending product's passage through the assembly line. By relieving plaintiffs of this evidentiary burden, it was argued, the theory of strict liability could do what negligence could not; it would provide adequate financial protection to consumers by facilitating recoveries for product-related injuries. This was socially desirable, it was maintained, because it shifted the loss from consumers who were powerless to protect themselves to manufacturers who were in a better position to discover the hazards inherent in their products and were better able to insure against the loss caused thereby. See: *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 63, 377 P.2d 897, 901, 27 Cal.Rptr. 697, 701 (1962); *Escola v. Coca-Cola Bottling Co.*, *supra* 124 Cal.2d at 460–64, 150 P.2d at 440–441. Shifting the loss from consumers to manufacturers, in turn, would advance the dual goals of product liability law: it would provide incentive for product manufacturers to market safer products and, as manufacturers internalized the cost of liability into the price of their

commodities, the loss sustained by individual consumers would be distributed among the members of the public at large. See: *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 877 (Alaska 1979); Keeton, *Product Liability and the Meaning of Defect*, 5 St. Mary's L.J. 30, 34–35 (1973). These policy goals could only be realized, however, by eliminating the consumer's burden of proving negligence. It was believed, therefore, that in order for the theory of strict liability to serve as an effective weapon in the consumer's battle against manufacturers of dangerously constructed products, the law had to be purged of negligence concepts which, if introduced, would only inhibit this cause.

Following formal adoption by the California Supreme Court in *Greenman v. Yuba Power Products, Inc., supra*, the theory of strict products liability was embraced by the American Law Institute and embodied in section 402A of the Restatement (Second) of Torts. Under this theory, a product which caused injury to a consumer became actionable if it left the manufacturer's control in a "defective condition unreasonably dangerous." Restatement (Second) of Torts § 402A(1). Analogizing heavily to contaminated food cases, the comments to section 402A made clear that the term "defective condition" was intended to apply only to those products which, because of a mishap during the manufacturing process, had been marketed in an unsafe condition. See: Model Uniform Product Liability Act § 104 analysis of that section, 44 Fed.Reg. 62,714, 62,722 (1979); Hoenig, *supra* at 118; Wade, *supra* at 830–832. It was not meant to apply to goods whose dangerous aspect was "characteristic of the product itself." See: Restatement (Second) of Torts § 402A comment h.

2. *The Illusory Distinction Between Strict Liability and Negligence in Design Cases*

Despite the apparent intendment of the drafters of section 402A, strict products liability came to be applied also in cases where the design of the product itself was called into question. The extension of the doctrine in this manner was made without inquiry as to whether the evidentiary prob-

lems which originally prompted strict liability in manufacturing defect cases also existed in cases involving design defects. Nor was consideration given to whether the theory was equipped to provide a workable standard of evaluation in such cases.

A strict liability standard has worked well in manufacturing defect cases where the injury-producing product does not conform to the manufacturer's own design or specifications. See: Senate Committee on Commerce, Science, and Transportation, Product Liability Act, S.Rep. No. 476, 98th Cong., 2d Sess. (1984), *reprinted in* 2A L. Frumer & M. Friedman, *supra* § 16F, at 3E–178. In these cases, the meaning of the term "defect" creates no difficulty; the product under scrutiny may be evaluated against the manufacturer's own design specifications, as manifested by other like products which come off the assembly line. See: Birnbaum, *supra* at 599. See also: *Prentis v. Yale Manufacturing Co., supra* 421 Mich. at 683, 365 N.W.2d at 182; *Dambacher v. Mallis, supra* 336 Pa.Super. at 57, 485 A.2d at 426. If the product fails to conform to the specifications, it is defective.

In design cases, however, articulation of the standard of defectiveness has been problematic. Unlike the faulty construction cases, where the offending product may be measured against the manufacturer's own design specifications, design defect cases provide no tangible standard for evaluating defectiveness. See: Birnbaum, *supra* at 599–600; Note, *Perpetuating Negligence Principles in Strict Products Liability: The Use of State of the Art Concepts in Design Cases,* 36 Syracuse L.Rev. 797, 802 n. 35, 808 (1985) [hereinafter cited as Note, *Perpetuating Negligence Principles* ]. In such cases it is the design of the product itself which comes under attack. See: Birnbaum, *supra* at 600; Hoenig, *supra* at. 121; Note, *Perpetuating Negligence Principles, supra* at 808. Because of the lack of an objective standard, the meaning of the term "defective" in design cases has proven elusive. See: 2 L. Frumer & M. Friedman, *supra* § 3.03[4][f][iv].

Although various tests for design defectiveness have been proposed,[2] there is general agreement among legal scholars that any evaluation of design defectiveness must invariably include some form of a risk/utility analysis. See: Twerski & Weinstein, *A Critique of the Uniform Product Liability Law—A Rush to Judgment*, 28 Drake L.Rev. 221, 229 (1979); Wade, *On Product "Design Defects" and Their Actionability*, 33 Vand.L.Rev. 551, 570 (1980); Note, *Perpetuating Negligence Principles*, *supra* at 805. A risk/utility analysis requires the balancing of the risks inherent in a product design against the utility of the product so designed. See: Keeton, *Products Liability— Design Hazards and the Meaning of Defect*, 10 Cum.L. Rev. 293, 310–311 (1979). Most courts employ a version of this balancing process in analyzing allegations of design defects. See: 2 L. Frumer & M. Friedman, *supra* § 3.03[4][iv], at 3–598–99 & n. 2 (collecting cases); Note, *Perpetuating Negligence Principles*, *supra* at 805 n. 52 (collecting cases). The courts in this Commonwealth are no exception. See: *Azzarello v. Black Brothers Co.*, *supra* 480 Pa. at 558, 391 A.2d at 1026 (in determining whether imposition of liability is justified, court should consider whether the "utility of a product outweigh[s] the unavoidable danger it may pose"). See also: *Keirs v. Weber National Stores, Inc.*, 352 Pa.Super. 111, 117–118, 507 A.2d 406, 409 (1986); *Burch v. Sears, Roebuck and Co.*, *supra* 320 Pa.Super. at 450, 467 A.2d at 618; *Smialek v. Chrysler Motors Corp.*, *supra* 290 Pa.Super. at 502, 434 A.2d at 1256.

The risk/utility analysis is nothing more than a detailed version of the balancing process used in evaluating reasonable care in negligence cases. See: *Prentis v. Yale Manufacturing Co.*, *supra* 421 Mich. at 687, 365 N.W.2d at 184; Birnbaum, *supra* at 649; Powers, *supra* at 784. The question under either analysis is whether the manufacturer acted reasonably in choosing a particular product design, given the probability and seriousness of the risk posed by

**2.** These tests have been discussed at length in Birnbaum, *supra*.

the design, the usefulness of the product in that condition, and the burden on the manufacturer to take the necessary steps to eliminate the risk. See: Senate Committee on Commerce, Science, and Transportation, Product Liability Act, S.Rep. No. 476, 98th Cong., 2d Sess. (1984), *reprinted in* 2A L. Frumer & M. Friedman, *supra* § 16F, at 3E–180. A determination that the risk of harm outweighs the utility of a particular product design necessarily decides that the manufacturer's own evaluation of these factors prior to marketing the product has been unreasonable. See: Note, *Perpetuating Negligence Principles, supra* at 808. From this it is apparent that the focus of the risk/utility analysis is not upon the product, as it is purported to be, but rather is upon "the judgment (i.e. conduct) of the manufacturer." Birnbaum, *supra* at 609–610. See: *Prentis v. Yale Manufacturing Co., supra* at 687, 365 N.W.2d at 184. As Professor Birnbaum has observed, "[c]onceptually and analytically, this approach bespeaks negligence." Birnbaum, *supra* at 610.

Still, proponents justify strict liability in design cases on the ground that it is easier than negligence to prove. See: *Phipps v. General Motors Corp.*, 278 Md. 337, 343, 363 A.2d 955, 958, 963 (1976). As we have seen, this reasoning has merit in cases where the offending product has been improperly constructed or manufactured. In such cases, the theory of strict liability relieves the plaintiff of the nearly insurmountable evidentiary burden of proving negligence in the manufacturing process. Problems of proof, however, have never been an impediment in design cases. See: 1A L. Frumer & M. Friedman, *supra* §§ 7.01[1], [2], [4], at 104.55–111 (collecting cases dating back to the 1920s in which liability was imposed for negligent design).

There is but one distinction between the evidentiary requirements of negligence and strict liability in design cases. Unlike strict liability, the plaintiff in a negligence action must show that the manufacturer either knew or should have known of the dangers inherent in the design of its

product.[3] See: Birnbaum, *supra* at 619; Note, *Perpetuating Negligence Principles*, *supra* at 804. This evidentiary hurdle, however, is not difficult to overcome. Indeed, the proof necessary to satisfy this burden may consist merely of expert testimony concerning the design risks which were known or knowable at the time the offending product was placed on the market. See: 1A L. Frumer & M. Friedman, *supra* § 12.01[1], at 254.18–19. Moreover and in any event, it is evident that plaintiffs in strict liability actions, although not required to do so, will generally "come forward with detailed technical evidence tending to prove that the manufacturer was either aware of the nature and gravity of the risk posed by the challenged product or that he could have designed the product more safely." Birnbaum, *supra* at 647–648. Because strict liability and negligence employ the same balancing process to assess liability, proof sufficient to establish liability under one theory will in most instances be sufficient under the other. See: 2 L. Frumer & M. Friedman, *supra* § 3.03[4] at 3–609. At least one commentator has opined that, in a strict liability action based upon defective design, "it is difficult to conceive that a complex trial may unfold for weeks without proof regarding unreasonable dangers, state of the art, functional utility of the product, styling, price, and a host of other criteria usually found in negligence cases." Hoenig, *supra* at 118 n. 29. The assumption that negligent design is more difficult to prove than design defectiveness, therefore, is fallacious.

3. A manufacturer is held to the standard of an expert in the field and, as such, is required to "keep reasonably abreast of scientific knowledge and discoveries touching his product and of techniques and devices used by practical men in his field." *Feldman v. Lederle Laboratories*, 97 N.J. 429, 453, 479 A.2d 374, 386–387 (1984), quoting 2 F. Harper & F. James, *The Law of Torts* § 28.4 (1956). See: Senate Committee on Commerce, Science, and Transportation, Product Liability Act, S. Rep. No. 476, 98th Cong., 2d Sess. (1984), *reprinted in* 2A L. Frumer & M. Friedman, *supra* § 16F, at 3E–185–86. "The information which a manufacturer should have known would include information that would be obtainable from a reasonable inquiry of experts and a reasonable research of scientific literature." *Prosser and Keeton on Torts* § 96, at 685 (5th ed. 1984).

### 3. *The Move Toward a Negligence Standard in Design Cases*

If the only shortcoming in the doctrine of strict liability were that it was no easier to prove than negligence, the viability of the doctrine as a theory of recovery in design cases would not be questioned. A more serious problem, however, is that strict liability for design defects purports to eschew the negligence principles which lie at the heart of its standard of evaluation. Because of this analytical inconsistency, the theory of strict liability, when applied in design cases, is almost incomprehensible not only to jurors, but also to members of the bench and bar. This confusion has led to random and unpredictable results in design defect cases.

It is this uncertainty which has caused several commentators to recommend that negligence be employed as the exclusive theory for assessing liability in design cases. See: Birnbaum, *supra;* Hoenig, *supra;* Powers, *supra;* Note, *Perpetuating Negligence Principles, supra.* Heeding this recommendation, courts in several jurisdictions now recognize a negligence standard as the only appropriate analytical vehicle for determining design defect liability. See: *Prentis v. Yale Manufacturing Co., supra; Holm v. Sponco,* 324 N.W.2d 207 (Minn.1982), *followed in Billota v. Kelley Co.,* 346 N.W.2d 616 (Minn.1984); *Rix v. General Motors Corp.,* 723 P.2d 195 (Mont.1986). The Model Uniform Product Liability Act, 44 Fed.Reg. 62,714 (1979) (UPLA), which was published in 1979 by the Department of Commerce for voluntary use by the states, also adopted a fault test for determining design defects.[4] A similar fault-

---

**4.** Section 104(B) of the UPLA provides:

(1) In order to determine that the product was unreasonably unsafe in design, the trier of fact must find that, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms outweighed the burden on the manufacturer to design a product that would have prevented those harms, and the adverse effect that alternative design would have on the usefulness of the product.

(2) Examples of evidence that is especially probative in making this evaluation include:

based system has been proposed in two legislative bills presently being considered by Congress. See: Kasten Bill, S. 2631, 97th Cong., 2d Sess. (1982), *reintroduced as* S. 44, 98th Cong., 2d Sess. (1983), *reintroduced as amended* S. 100, 99th Cong., 1st Sess. (1985), *reprinted in* 2A L. Frumer & M. Friedman, *supra* § 16F; Shumway Bill, H.R. 2568, 99th Cong., 1st Sess. (1985), *reprinted in* 2A L. Frumer & M. Friedman, *supra* § 16G.[5]

> (a) Any warnings and instructions provided with the product;
> (b) The technological and practical feasibility of a product designed and manufactured so as to have prevented claimant's harm while substantially serving the likely user's expected needs;
> (c) The effect of any proposed alternative design on the usefulness of the product;
> (d) The comparative costs of producing, distributing, selling, using, and maintaining the product as designed and as alternatively designed; and
> (e) The new or additional harms that might have resulted if the product had been so alternatively designed.
> 44 Fed.Reg. at 62,721.

5. The Kasten Bill, as originally introduced, provided in section 5:

> (b)(1) A product is unreasonably dangerous in design or formulation if, at the relevant point in time—
> (A) the manufacturer knew, or, through the exercise of reasonable prudence, should have known about the danger which allegedly caused the claimant's harm; and
> (B) a reasonably prudent person in the same or similar circumstances would not have manufactured the product or used the design or formulation that the manufacturer used.
> (2) A product is not unreasonably dangerous in design or formulation if the manufacturer proves by a preponderance of the evidence that, at the relevant point in time—
> (A) a means to eliminate the danger that caused the harm was not within practical technological feasibility, and the benefits and usefulness of the product to the public outweighed the likelihood and probable seriousness of the harm;
> (B) the harm was caused by an unavoidably dangerous product; or
> (C) the harm was caused by an unsafe aspect of a product which was an inherent characteristic of the product and which would be recognized by the ordinary person who uses or consumes the product with the ordinary knowledge common to the community.
> (3) As used in paragraph (2)(B), "an unavoidably dangerous product" means a product that, at the relevant point in time—
> (A) is useful and desirable to the public;
> (B) has a known but reasonable risk which, in light of the state of scientific and technical knowledge at that time, can not be made

safe without impairing the effectiveness of the product's intended and ordinary use; and

(C) would have been made by a reasonable manufacturer using that particular design or formulation.

(4) As used in this subsection, "relevant point in time" means the earlier of the time of manufacture of a product or certification of an aircraft or its parts or accessories by the Federal Aviation Administration.

Kasten Bill, *supra, reprinted in* 2A L. Frumer & M. Friedman, *supra* § 16F, at 3E–176.1–.3.

Section 5 of the Shumway Bill provides, in relevant part, as follows:

(a)(1) In any product liability action brought against a manufacturer for harm allegedly caused by a product, the manufacturer shall be liable to a claimant only if the claimant proves by a preponderance of the evidence—

(A) that the product was unreasonably dangerous—

. . . .

(ii) in design, under subsection (c), and that the manufacturer was negligent in selling the product in such condition;

. . . .

. . . .

(c)(1) A product shall be considered unreasonably dangerous in design only if it is determined that the manufacturer failed to adopt an alternative design that—

(A) was available to the manufacturer when the product was designed, under paragraph (2);

(B) was on balance better than the chosen design, under paragraph (3); and

(C) would have prevented the claimant's harm.

(2) An alternative design shall be considered to have been available to the manufacturer when the product was designed if the alternative design was known at that time or in the exercise of reasonable care should have been known by the manufacturer to exist and to be feasible for use in the product by the manufacturer.

(3) An alternative design shall be considered to have been better than the manufacturer's chosen design if the alternative design—

(A) was significantly safer or less likely to cause harm than the chosen design. The alternative design was safer or less likely to cause harm than the chosen design if the alternative design would have provided both—

(i) better protection from harm than that of the chosen design as to the particular hazard which allegedly caused the claimant's harm; and

(ii) better overall protection from harm than that of the design. The overall protection from harm of the alternative design is better if the hazards it eliminates are greater than any new hazards it creates for any persons and for any uses;

(B) was not more expensive than the chosen design, unless the added protections from harm of the alternative design were significantly greater than the added expense;

(C) was not less useful or desirable than the chosen design, unless the added protections from harm of the alternative design was

Under a pure negligence approach, the manufacturer would be liable for harm caused by a product if (1) there existed an alternative design which (a) was safer than the design used, i.e., one that would have reduced the risk of harm and (b) was available at the time of manufacture, i.e., was within the realm of scientific knowledge and was capable of implementation, and (2) the likelihood that the product would cause harm and the probable seriousness of that harm outweighed the burden on the manufacturer to adopt the alternative design. Considerations relevant for evaluating the burden on the manufacturer would include (1) whether the alternative design would create new or additional safety hazards, (2) whether it would detract from the utility or desirability of the product, and (3) whether it would be more expensive to research, develop, produce, sell, use, and maintain the product with the alternative design.

The reasons for adopting a pure negligence standard in design cases are numerous.

First, unlike manufacturing defects, design defects result from deliberate and documentable decisions on the part of manufacturers, and plaintiffs should be able to learn the facts surrounding these decisions through liberalized modern discovery rules. Access to expert witnesses and technical data are available to aid plaintiffs in

significantly greater than the losses of usefulness or desirability; and

(D) was not in violation of any statute, regulation, or mandatory safety standard of Federal or State government.

(4) Any provision of subsection (c) notwithstanding a product shall not be considered to have been unreasonably dangerous in design where the claimant's harm resulted from—

(A) a manner of use of the product other than that which would be reasonably expected of an ordinary person who is likely to use the product; or

(B) an alteration or modification of the product other than (i) that which would be reasonably expected of an ordinary person who is likely to use the product, and (ii) which the product seller could reasonably prevent or control; or

(C) an aspect of the product not feasible of being made safe without substantially impairing the product's usefulness.

Shumway Bill, *supra, reprinted in* 2A L. Frumer & M. Friedman, *supra* § 16G, at 3E–301–04.

proving the manufacturer's design decision was ill considered.

Second, to the extent that a primary purpose of products liability law is to encourage the design of safer products and thereby reduce the incidence of injuries, a negligence standard that would reward the careful manufacturer and penalize the careless is more likely to achieve that purpose. A greater incentive to design safer products will result from a fault system where resources devoted to careful and safe design will pay dividends in the form of fewer claims and lower insurance premiums for the manufacturer with a good design safety record.[6]

6. Since adoption of the theory of strict liability, there has been an increase both in the number of product liability cases instituted, and in the size of jury verdicts and settlements obtained in those cases. See: Birnbaum, *supra* at 644. Indeed, under the standard announced by our Supreme Court in *Azzarello v. Black Brothers Co., supra,* manufacturers must be deemed to be virtual guarantors of their product's safety, and thus they have become, for practical purposes, absolutely liable for harm caused by their commodities. See: *McKay v. Sandmold Systems, Inc.,* 333 Pa.Super. 235, 239, 482 A.2d 260, 263 (1984) (discussing academe's criticism of *Azzarello* ).

At least two current members of our Supreme Court have recognized the dangers of allowing unlimited recovery in tort cases. Chief Justice Nix, the author of the *Azzarello* decision, has recently noted:

[A] basic fallacy with the thinking of those who propose unlimited expansion of tort recovery is the failure to recognize that it is the consumer public that ultimately must bear the loss for the inflationary spiral that follows in its wake. More frequent judgments with escalating awards creates a situation that all policy holders, and not the insurance companies, ultimately must meet. The rising costs, generated by increasing numbers of law suits and higher judgments, are tolerable provided that the occasion for the injury justifies the action and the recovery reflects the actual loss. If either is out of kilter an undue burden is unfairly passed on to the innocent citizen policy holders.

*Amadio v. Levin,* 509 Pa. 199, 231–232, 501 A.2d 1085, 1101–1102 (1985) (Nix, C.J., dissenting) (rejecting adoption of survival and wrongful death actions for stillborn children). Justice Flaherty has also stated:

This body, the Supreme Court of the fourth largest state of the United States, must take a leading role in re-evaluating the social utility of an ever expanding and increasingly imaginative tort system. It is illusory to believe the public does not pay for tort recoveries, or that resources for such are limitless. As it is with everything, a *balance* must be struck—certain limits drawn. We are, in the end, dealing with money, and that money must come

The incentive will result from the knowledge that a distinction is made between those who are careful and those who are not.

Third, a verdict for the plaintiff in a design defect case is the equivalent of a determination that an entire product line is defective. It usually will involve a significant portion of the manufacturer's assets and the public may be deprived of a product. Thus, the plaintiff should be required to pass the higher threshold of a fault test in order to threaten an entire product line. The traditional tort law of negligence better serves this purpose.

Fourth, a fault system incorporates greater intrinsic fairness in that the careful safety-oriented manufacturer will not bear the burden of paying for losses caused by the negligent product seller. It will also follow that the customers of the careful manufacturer will not through its prices pay for the negligence of the careless. As a final bonus, the careful manufacturer with fewer claims and lower insurance premiums may, through lower prices as well as safer products, attract the customers of less careful competitors.

*Prentis v. Yale Manufacturing Co., supra* 421 Mich. at 689, 365 N.W.2d at 185. In addition, juries are familiar with the theory of negligence and are comfortable assessing liability on the basis of fault. Moreover, fault-based concepts such as comparative negligence and state of the art can be applied with analytical consistency under a pure

from somewhere—from someone: the public pays for the very most part by increased insurance premiums, taxation, prices paid for consumer goods, medical services, and in loss of jobs when the manufacturing industry is too adversely affected. A sound and viable tort system—generally what we now have—is a valuable incident of our free society, but we must protect it from excess lest it becomes unworkable and alas, we find it replaced with something far from desirable.

*Mazzagatti v. Everingham,* 512 Pa. 266, 281, 516 A.2d 672, 680 (1986) (Flaherty, J., concurring) (rejecting recognition of cause of action for negligent infliction of emotional distress in instances where a close relative does not observe accident, but arrives a few minutes later and observes the victim). Adopting a negligence standard in design cases would best protect our tort system from the excesses caused by the imposition of strict liability.

negligence approach. Perhaps most importantly, "[i]mposing a negligence standard for design defect liability is in many cases only to define in a coherent fashion what litigants are in fact arguing and what jurors are in essence analyzing." Birnbaum, *supra* at 649.

Irresistible though these reasons may appear, we, as an intermediate appellate court, are not empowered to effect the change they compel. This can only be done, if at all, by the Supreme Court or by the legislature. In the meantime, we apply the law as it exists in its present form.

## B.

■ The trial court correctly concluded, under existing law, that negligence principles generally are not to be injected into an action based upon the theory of strict products liability. See: *Berkebile v. Brantly Helicopter Corp., supra* 462 Pa. at 94, 96, 337 A.2d at 899, 900; *Dambacher v. Mallis, supra* 336 Pa.Super. at 60, 485 A.2d at 428; *Smialek v. Chrysler Motors Corp., supra* 290 Pa.Super. at 501, 505, 434 A.2d at 1256, 1258. This does not mean, however, that evidence concerning the negligence of the plaintiff and of other individuals involved in a product-related accident cannot be considered for any purpose. On the contrary, evidence of another's negligent conduct is admissible where it is relevant to establish causation. *Bascelli v. Randy, Inc., supra* 339 Pa.Super. at 260, 488 A.2d at 1113. See: *Sherk v. Daisy-Heddon,* 498 Pa. 594, 450 A.2d 615 (1982) (plurality opinion); *Kuisis v. Baldwin-Lima-Hamilton Corp.,* 457 Pa. 321, 319 A.2d 914 (1974) (plurality opinion); *Keirs v. Weber National Stores, Inc., supra; Burch v. Sears, Roebuck and Co., supra.*

■ The law is well settled that in a products liability action a plaintiff must prove that a defective product has been a substantial factor in causing his or her injuries. See: *Carrecter v. Colson Equipment Co., supra* 346 Pa. Super. at 100, 499 A.2d at 329; *Bascelli v. Randy, Inc., supra* 339 Pa.Super. at 259, 488 A.2d at 1113. Section 433 of the Restatement (Second) of Torts, which has been

adopted as the law in Pennsylvania, lists the considerations which are important in determining whether negligent conduct (or a defective product) is a substantial factor in producing harm. It states:

> The following considerations are *in themselves* or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:
>
> (a) *the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;*
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
>
> (c) lapse of time.

Restatement (Second) of Torts § 433 (emphasis added). These considerations are significant for three reasons:

> First, they are important as considerations which the jury should take into account when the substantial factor question is left to them. Second, they are important to the trial judge in so framing his instructions as to call the jury's attention to such of these considerations as are pertinent to the facts which the jury might reasonably infer from the evidence. Third, they are important to a court in determining whether upon the evidence there is room for a reasonable difference of opinion as to whether the defendant's negligence is a substantial factor in bringing about the other's harm.

*Id.* comment a. Moreover, an intervening act which operates as a superseding cause of the injury will relieve the manufacturer from liability. See: Restatement (Second) of Torts § 440 comment b. See also: *Burch v. Sears, Roebuck and Co., supra* 320 Pa.Super. at 452, 467 A.2d at 619. If the negligent character of the third person's intervening act or the reasonable foreseeability of its being done is a factor in determining whether the intervening act relieves

the manufacturer from liability for his defective product, and under the facts there is room for reasonable difference of opinion as to whether such act was negligent or foreseeable, the question must be left to the jury. See: Restatement (Second) of Torts § 453 comment b. See also: *Miller v. Checker Yellow Cab Co. of Bethlehem, Inc.*, 465 Pa. 82, 88, 348 A.2d 128, 130 (1975); *Flickinger Estate v. Ritsky*, 452 Pa. 69, 75, 305 A.2d 40, 43 (1973).

In *Bascelli v. Randy, Inc., supra,* the plaintiff sustained injuries when he lost control of the motorcycle which he had been riding and crashed into a guardrail. He commenced a product liability action against the manufacturer of the front end assembly of the motorcycle, alleging that the loosening of the front end assembly had caused the accident. During a pre-trial deposition, the plaintiff admitted that he had been travelling at a speed of approximately 100 miles per hour prior to the accident. At trial, defense counsel attempted to elicit the plaintiff's admission that the accident had been caused by excessive speed and not by a defective front end assembly. The trial court refused to allow such evidence on the ground that it tended to show contributory negligence which was irrelevant in a products liability case. On appeal, a panel of this Court held that it was error to exclude the evidence. In so holding, the Court noted that the cause of the accident was an issue of fact to be decided by the jury. *Id.* 339 Pa.Super. at 260, 488 A.2d at 1113. The plaintiff's admission that he had lost control of the motorcycle while going 100 miles per hour was relevant to show the cause of the accident, the Court concluded, and could not be excluded merely because there was other evidence which tended to show that the loosening of the front end assembly had caused the plaintiff to lose control. *Id.*, 339 Pa.Superior Ct. at 259–260, 488 A.2d at 1113. The exclusion of this evidence, it was held, necessitated a new trial.

A new trial may be granted if the trial court abused its discretion or committed an error of law which controlled the outcome of the case. See: *Allison v. Snell-*

*ing & Snelling, Inc.,* 425 Pa. 519, 521, 229 A.2d 861, 862 (1967); *Mohn v. Hahnemann Medical College and Hospital of Philadelphia,* 357 Pa.Super. 173, 174, 515 A.2d 920, 921 (1986). In the instant case, the trial court repeatedly instructed the jury that the carelessness of Foley and Keefer, the forklift operator, was irrelevant and was not to be considered by them in determining the defendants' liability. In light of *Bascelli, supra,* this was erroneous. This error, moreover, had an inescapable effect on the outcome of the case. Although the trial court did not usurp the jury's function by determining the cause of the accident, it excluded from the jury's consideration evidence which was essential to make such a determination. In deciding whether the alleged defects in the forklift truck were a substantial factor in causing Foley's injuries, it was important for the jury to consider "the number of other factors which contribute[d] in producing the harm and the extent of the effect which they [had] in producing it." Restatement (Second) of Torts § 433(a). Arguably, the activities of Foley and Keefer prior to the accident were factors which either contributed to or solely caused the accident. Their inattention and not the design of the forklift truck may have been the legal cause of the accident. Trucks, like automobiles, can be designed to reduce the dangers inherent in their operation, but no design, however perfect, has yet been able to eliminate the risk which rides with inattention. When another driver or pedestrian is inattentive at the same time as the operator, an accident is likely to occur irrespective of the presence of wider visibility, mirrors, lights, or horns. Thus, in the instant case it was erroneous for the trial court to prevent the jury from considering the inattention of plaintiff and the driver of the forklift in determining the cause of the accident. A new trial, therefore, is necessary.

### III. *Other Issues Argued by Industrial*

Industrial cites another alleged error in the trial court's jury instructions which it contends warrants a new trial on the issue of liability. It maintains that the judge

improperly charged the jury that the forklift truck could be found defective if it lacked any of the design changes recommended by plaintiff's expert. Industrial waived the right to challenge this instruction, however, when it failed to make a proper specific objection to the instruction during trial. See: *Tagnani v. Lew,* 493 Pa. 371, 426 A.2d 595 (1981); *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974).

Industrial also contends that it should be granted a new trial because the verdict was excessive. In light of our decision to reverse the verdict and to remand for a new trial, we need not review this issue. Were the result otherwise, we would find that the $15,000,000 verdict was excessive. If invested at the legal rate, the amount of the verdict would produce an annual income of $900,000. This exceeded by far the plaintiff's earning capacity, and although appellant sustained serious and incapacitating injuries, the record does not support this grossly excessive verdict. In the absence of other error, therefore, we would remand for a new trial to redetermine appellee's damages.

IV. *The Judgment of Indemnity in Favor of Industrial and Against Clark*

In its cross-appeal, Clark contends that the trial court erred by awarding indemnity against it in favor of Industrial. This issue is moot. Before there can be an award of indemnity, there must of necessity be a verdict against at least one defendant. In light of our decision to reverse the verdict and remand for a new trial, the judgment of indemnity must be vacated. An award of indemnity must then await the outcome of the new trial. We note, however, that should the outcome of the second trial be the same as or similar to the first, the award of indemnity in favor of Industrial would be appropriate for the reasons stated by the trial court in Sections III and IV of its opinion dated June 27, 1985.

Reversed and remanded for a new trial. Jurisdiction is not retained.