**Vinicio BALLARINI, Plaintiff,**

v.

**CLARK EQUIPMENT CO., Defendant.**

**Civ. A. No. 92–3924.**

United States District Court,
E.D. Pennsylvania.

Dec. 14, 1993.

Anthony Witlin, Philadelphia, PA, for plaintiff.

Louis Bell, Liebert, Short & Hirshland, Louis Bell, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for defendant.

## MEMORANDUM

ROBERT F. KELLY, District Judge.

Plaintiff in this products liability case, a forklift operator with over 40 years experience, was operating a forklift at a warehouse in Philadelphia on November 11, 1991 when he stopped the forklift and dismounted to manually pick up a box containing a television. As plaintiff was lifting the box, he looked up and saw the forklift coming at him. The forklift struck and injured plaintiff.

This case followed against defendant, the manufacturer of the forklift, based on a claim that the accident would not have occurred had the forklift come equipped with a "dead man's switch."

The trial lasted four days, beginning on March 8, 1993. Defendant moved for a directed verdict at the close of plaintiff's case on two separate grounds: first, based on the Pennsylvania Supreme Court's decision in *Azzarello v. Black Bros.*, 480 Pa. 547, 391 A.2d 1020 (1978), as a matter of public policy, strict liability should not attach in this case, and second, that plaintiff had not satisfied his burden of showing a safer design alternative. I denied defendant's motion for a directed verdict. Defendant did not renew its motion for a directed verdict at the close of all the evidence.

The jury found in favor of plaintiff, and awarded $400,000 in damages. I have before me defendant's post-trial motions, which include a motion for a judgment notwithstanding the verdict and a motion for a new trial.

 The law of this circuit is clear that a judgment notwithstanding the verdict may not be granted if no directed verdict motion was made at the close of all the evidence. *See Keith v. Truck Stops Corp. of America*, 909 F.2d 743, 744 (3d Cir.1990); *Lowenstein v. Pepsi Cola Bottling Co. of Pennsauken*, 536 F.2d 9 (3d Cir.1976).

However, the ordering of a new trial is a matter committed to the sound discretion of the trial court. *Bonjorno v. Kaiser Aluminum and Chemical Corp.*, 752 F.2d 802, 812 (3d Cir.1984) *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986). A court may grant a new trial if doing so is required to prevent injustice or to correct a verdict that was against the weight of the evidence. *See, e.g., Grace v. Mauser–Werke GMBH*, 700 F.Supp. 1383, 1388 (E.D.Pa. 1988).

After hearing and considering all the evidence in this case, I am convinced that the imposition of strict liability, and a verdict in plaintiff's favor should not have been allowed as a matter of law. However, in that defendant did not move for a directed verdict at the close of all the evidence, defendant's motion for a judgment notwithstanding the verdict is not properly before the court at this time. Therefore, for the reasons stated below, I will order a new trial.

*I. Public Policy*

Under the *Azzarello* ruling, a court applying the law of Pennsylvania in a strict liability case must determine, prior to submission to a jury, whether a defendant owed any duty to plaintiff as a matter of public policy. Many courts have struggled with the *Azzarello* ruling over the years, and some have attempted to offer a framework for analyzing the *Azzarello* "public policy" determination. *See e.g., Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984); *see also Shetterly v. Crown Controls Corp.*, 719 F.Supp. 385 (W.D.Pa.1989), *aff'd without opinion*, 898 F.2d 139 (3d Cir.1990).

The varying interpretations of *Azzarello* have not succeeded in providing any consistent approach. The Court of Appeals for this circuit has observed that the appellate courts of the Commonwealth of Pennsylvania appear to have taken differing approaches in attempting to explain what *Azzarello* means. *See Griggs v. BIC Corporation*, 981 F.2d 1429, 1439 (3d Cir.1992); *Dillinger v. Caterpillar, Inc.*, 959 F.2d 430 (3d Cir.1992).

What a trial court is left with then is the bare language of the *Azzarello* ruling, that a product is "unreasonably dangerous" if, and only if, the product "left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Azzarello, supra*, 391 A.2d at 1027, *quoted in Griggs, supra*, 981 F.2d at 1433. In this case, it is the first part of the above-quoted language which is at issue. Plaintiff's case is based on the allegation that the forklift at issue lacked an element necessary to make it safe for its intended use, namely, a dead man's switch which would have placed the forklift into neutral when plaintiff dismounted.

It is a commentary on the current state of the law of Pennsylvania with regard to products liability that while plaintiff objected to any testimony on the subject, plaintiff did not feel the need to even dispute the following:

1. The forklift was equipped with a parking brake. Testimony of Ballarini, N.T. March 8, 1993 at 106.

2. Plaintiff did not apply the parking brake before stepping down from the forklift, immediately prior to the accident. Testimony of Ballarini, N.T. March 8, 1993, at 106.

3. Had plaintiff applied the parking brake, the accident would not have occurred. Testimony of Clauser, N.T. March 9, 1993 at 106.[1]

Plaintiff's objections to any and all questions regarding the existence of a parking brake were based on the Court of Appeals' decision in *Dillinger*, in which the Court of Appeals held that evidence of plaintiff's conduct was inadmissible to negate the "causation" element of a strict liability case. *See Dillinger, supra*, 959 F.2d at 444.

In *Dillinger*, plaintiff was injured when the Caterpillar dumpster he was driving up a hill stalled-out, due to a rupture of the dumpster's hydraulic hoses. After stalling, the dumpster began to roll back down the hill,

---

1. In fact, there was no dispute that the forklift was not mechanically defective in any way at the time of the accident.

and without hydraulics, plaintiff was unable to brake the dumpster to a halt. The dumpster rolled backwards off an embankment, and plaintiff was severely injured. *Id.* at 432–33. At the time of the accident, plaintiff had been operating the dumpster in question for approximately six months. *Id.* at 434.

At trial, the defense maintained that plaintiff's injuries were caused by his failure to use the dumpster's alternative braking systems, his failure to read the operator's manual, and his lack of experience in operating the dumpster. *Id.* at 440. Evidence was undisputed that even after the rupture of the hydraulic hoses, plaintiff would not have been able to tell by pumping the brake pedal that the hydraulics were no longer operable. *Id.* at 433.

The *Dillinger* decision studied the mixed signals the Pennsylvania courts have transmitted concerning the meaning of *Azzarello*. Specifically, the Court of Appeals carefully distinguished cases in which plaintiff's conduct actively contributed to the cause of the accident, (*see Bascelli v. Randy, Inc.,* 339 Pa.Super. 254, 488 A.2d 1110 (1985); *Foley v. Clark Equipment Co.,* 361 Pa.Super. 599, 523 A.2d 379, (1987) *allocatur denied,* 516 Pa. 614, 531 A.2d 780 and 516 Pa. 641, 533 A.2d 712 (1987)), as opposed to being merely insufficient to prevent the accident, which was the case in *Dillinger.*

■ The evidence is clear that plaintiff's conduct in this case belongs in the first category mentioned above. Unlike the plaintiff in *Dillinger,* plaintiff in the case at hand was an experienced, highly skilled operator. Plaintiff's failure to utilize the forklift's most obvious safety system, i.e., the parking brake, was unquestionably a major factor, if not the only factor, in setting in motion the events which followed. Plaintiff's conduct was relevant to the issue of causation and to ignore any and all evidence of that conduct would, in effect, negate the causation element in a products liability case. This would not only open the courtroom door to absurd results, it would also apply a rule of Pennsylvania law which is not applied consistently by Pennsylvania courts. *See, generally, Kern v. Nissan Industrial Equipment Company,* 801 F.Supp. 1438, 1442–43 (M.D.Pa.1992).

I find that considering all the evidence on the record, including the existence and non-use of the forklift's parking brake, the forklift in question did not lack an element necessary to make it safe for its intended use. A directed verdict in favor of defendant should have been granted based on those grounds alone.

## II. *Plaintiff's Alternative*

■ In *Habecker v. Clark Equipment Co.,* 942 F.2d 210, 215 (3d Cir.1991), the Court of Appeals held that a fact finder can only determine whether a particular design was defective after hearing evidence about what designs were feasible at the time the product was manufactured and whether they were in fact safer. Given the flaws in plaintiff's case described above, it was particularly important for plaintiff to present a feasible alternative to the forklift's existing safety features.

Plaintiff's proposal in this regard was presented by one Craig D. Clauser. To raise what Clauser repeatedly referred to as a "concept" to the level of an alternative design would be to give it a substance the concept lacked in court.

Clauser concluded that the forklift was defective because it did not come equipped with an interlock device which would disable the "forward/reverse function of the vehicle," i.e., put the forklift into neutral when the operator got out of the seat. N.T. March 9, 1993 at 47. There was no dispute that no internal combustion forklift ever manufactured had come equipped with such a device, nor was one commercially available at present. N.T. March 9, 1993 at 84–85.

Clauser's testimony largely consisted in explaining how such a device would work, stating that similar devices had been utilized in other vehicles, (including one model of electrical forklifts), and opining that he saw no reason why such a design could not be used by what plaintiff's counsel insisted on referring to as a "big company like Clark for a machine like Vince's." N.T. March 9, 1993 at 137. Clauser prepared no drawings or a prototype. He had never previously done any work on a forklift design. In fact, plaintiff's counsel was almost nonchalant in his

admission in court that Clauser had made no effort to develop the concept he presented at trial as an alternative design:

> Mr. Witlin: ... [Mr. Clauser] did not design this, he came forward with a concept. He's already expressed that he'd be happy to do the designs if Clark would hire him to do it. N.T. March 9, 1993 at 87.

As the above suggests, plaintiff did little or nothing to establish the feasibility of this alternative. The separate question of whether such a design, even if summoned from the realm of imagination, would actually be safer was even more dubious. On cross-examination, the defense brought out a number of weaknesses to Clauser's proposal, particularly concerning the sensitivity setting of the seat, and how the seat should be tested. The defense introduced their own experts who testified that even if a dead man's switch were implemented on an internal combustion forklift, the safety problems entailed by such a design would outweigh the alleged benefits.[2]

I must note what appears to be an additional flaw to plaintiff's theory: that while plaintiff's proposal for a dead man's switch would have the effect of placing the forklift into neutral when the operator gets off the seat, plaintiff's own testimony was that he had placed the forklift into neutral before getting off. Therefore, it is impossible to see how plaintiff's alternative would have altered, much less prevented, the incident which occurred in this case.

I find that a directed verdict should have been granted on the inadequacy of plaintiff's proposed alternative design, and that this point also mandates the granting of a new trial.

### III. *Attorney Misconduct*

■ A third ground for the granting of a new trial is the misconduct of plaintiff's counsel. The long-recognized standard in this circuit for granting a new trial based on improper conduct by counsel was established

in *Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir.1978) in which the Court of Appeals stated that a court must place "restraints against blatant appeals to bias and prejudice." *Id.* See, e.g., *Dorsett v. American Izusu Motors, Inc.*, 805 F.Supp. 1212, 1219 (E.D.Pa.1992). A trial judge must determine where advocacy ends and appeals to bias and prejudice begins by examining the "cumulative thrust of plaintiff's counsel's argument." *Id; quoting Draper* at 95. See also *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 207 (3d Cir.1992).

In this case, the improper conduct of plaintiff's counsel began immediately, with his very first statement to the jury panel as voir dire began:

> Mr. Witlin: Thank you for being here. You're here now to be potentially selected as jurors in civil case, a case involving a heavy machine, a terrible and permanent injury, a machine with no dead man switch.
>
> Mr. Bell: Excuse me, Counsel, we're not to get into the substance of the case.
>
> Mr. Witlin: I'm not getting into the substance of the case, thank you.
>
> Mr. Bell: And I ask you not to or I'll ask to see the judge.
>
> Mr. Witlin: Thank you. And harm done to Vineccio (sic) Ballarini, who I call Vince ... N.T. March 8, 1993 at 2.

The above exchange might be viewed as harmless enough, were it not for the fact that these comments were merely the first shot in what became an unending barrage of improper comments, questions, objections, and even facial expressions, always made in the presence of the jury, which continued right up until the verdict. The cumulative impact of this conduct, which in my view was entirely premeditated, was to attempt to activate the jury's sympathy.

On several occasions, plaintiff's counsel pointedly alluded to the financial disparity between plaintiff and the defendant corporation. The flavor of plaintiff's counsel's con-

---

**2.** Specifically, the hinged seat advocated by Clauser would likely bring about greatly increased risks of lateral tip-overs and stalling.

The defense also demonstrated that the model of electrical forklift cited by Clauser as using a

dead man's switch, had only offered such a device as an option, and that this option had in fact been discontinued over two decades ago, due to various concerns, among them maintenance and safety.

duct throughout the trial is perhaps best illustrated by the following episode, in which plaintiff's counsel was supposedly trying to illicit a response from plaintiff which would describe the size of the warehouse where the accident took place:

Mr. Witlin: Is Lindbergh Boulevard where you were hurt, is that where you were hit by the forklift?

A: Yes.

Q: And Vince, you have been in my office, how big is my office?

A: Small.

Mr. Bell: I'm going to object, your Honor.

Mr. Witlin: I'm trying to get to the size of the warehouse. I mean, I'm trying.

The Court: Well, he's going to say it's smaller than your office or what?

Mr. Witlin: No, sir, larger than my office. Not as large as Mr. Bell's or this courtroom, but I'm going to get him to describe the size of the warehouse.

Mr. Bell: Your Honor, I'm also going to move—excuse me your Honor, I'd like to—

The Court: What earthly good does it to have—for you to have the witness say that something is not as large or is larger than your office, when the jury has no idea how large your office is? What does that convey to them?

Mr. Witlin: Because if I could get to the second or third—

The Court: Or that it's not as large as Mr. Bell's office? What is that supposed to be?

Mr. Witlin: Now, I wasn't going to ask him about Mr. Bell's office.

The Court: You did.

Mr. Witlin: But I wasn't going to ask him. I was going to ask him about the courtroom and then ask him about a soccer field and about the size of the warehouse he worked in so that the jury would have an idea of the size.

N.T. March 8, 1993 at 62–63.

Not all of the misconduct registered on the record, but the trial transcripts do record the following instances: references to facts not in evidence (N.T. March 9, 1993 at 115; 134–35); head shaking or scratching, as expressions of dismay or disbelief (N.T. March 9, 1993 at 123, 147; N.T. March 8, 1993 at 126.); and finally, what were seemingly endless objections, many, if not most based on already-decided issues.[3]

The effect of this conduct was to place the Court, in the eyes of the jury, into what amounted to an adversarial position. The best evidence of the cumulative impact is the question the jury sent back, just before the announcing their verdict:

Does the judge have the right to overrule/or rule on our amount if we find for plaintiff[?] N.T. March 11, 1993 at 117.

After being informed they should concern themselves with considering the evidence and the law, and not with any possible post-trial proceedings, the jury returned to the courtroom within 15 minutes and announced a $400,000 verdict for plaintiff. I believe the jury's question illustrates that the tactics of plaintiff's counsel were entirely successful in making an improper impact on the jury, and I would order a new trial based on his behavior alone.

Therefore, I am issuing the following order:

### *ORDER*

AND NOW, this 13th day of December, 1993, upon consideration of Defendant's, Clark Equipment Company, motion for judgment after trial, or in the alternative, motion for a new trial, and Plaintiff's responses, it is ORDERED that:

1. Defendant's motion for judgment after trial is DENIED; and

2. Defendant's motion for a new trial is GRANTED.

---

**3.** These were too numerous to detail, however as an example, the defense noted that plaintiff's counsel made 27 objections to the cross-examination of plaintiff's expert and 13 objections to the direct of one of the defense experts, and I see no reason to question the accuracy of these estimates.