971 A.2d 1228

**Judith R. BUGOSH, Administratrix of the Estate of Edward J. Bugosh, Deceased and Judith R. Bugosh, In Her Own Right**

v.

**I.U. NORTH AMERICA, INC., as Successor by Merger to the Garp Company, formerly known as the Gage Company, formerly known as Pittsburgh Gage and Supply Company, E.W. Bowman, Inc., Emhart Glass Inc., formerly known as Emhart Manufacturing Company, formerly known as Hartford Empire, F.B. Wright Company, Surface Combustion, Inc., Taylored Industries, Inc.**

**Appeal of I.U. North America, Inc.**

Supreme Court of Pennsylvania.

Argued Dec. 2, 2008.

Decided June 16, 2009.

Jennifer E. Watson, Esq., Robert B. Lawler, Willbraham, Lawler & Buba, P.C., Philadelphia, Susan Regrut Mitchell, Esq., Willbraham, Lawler & Buba, P.C., Pittsburgh, for I.U. North America, Inc.

Matthew R. Wimer, Esq., Wimer Law Offices, P.C., Oakmont, for Taylored Industries, Inc.

Janice Marie Savinis, Esq., Savinis, D'Amico & Kane, L.L.C., Pittsburgh, Clifford Alan Rieders, Esq., Pamela L. Shipman, Esq., Rieders, Travis, Humphrey, Harris, Waters & Waffenschmidt, Williamsport, for Judith R. Bugosh.

James J. Mulhall, Esq., Frank Stanek, Esq., for Surface Combustion, Inc.

Andrew Frank Adomitis, Esq., Leo Gerard Daly, Esq., Grogan Graffam, P.C., Pittsburgh, for F.B. Wright Company.

Thomas Joseph Jezewski, Esq., L. John Argento, Esq., Swartz Campbell, L.L.C., Pittsburgh, for Emhart Glass Inc.

Nancy L. Winkelman, Esq., Samuel William Silver, Esq., Stephen Andrew Fogdall, Esq., Schnader Harrison Segal & Lewis, L.L.P., Philadelphia, for amicus curiae Washington Legal Foundation (WLF).

Michael Lee Martinez, Esq., Crowell & Moring, L.L.P., for amicus curiae Pennsylvania Chamber of Business and Industry et al.

John Edward Iole, Esq., Charles H. Moellenberg, Jr., Esq., Laura E. Ellsworth, Esq., Margaret Caitlin Gleason, Esq., Jones Day, Pittsburgh, for amicus curiae Sherwin–Williams Company.

James Michael Beck, Esq., Dechert L.L.P., Philadelphia, for amicus curiae Product Liability Advisory Counsel.

Edward Michael Koch, Esq., Jerrold Paul Anders, Esq., James Wright Scott, Jr., Esq., White and Williams, L.L.P.,

Philadelphia, for amicus curiae Pennsylvania Defense Institute and the Insurance Federation of Pennsylvania.

James Joseph Pettit, Esq., Gene Locks, Esq., Jonathan W. Miller, Esq., Mitchell S. Cohen, Esq., Locks Law Firm, Philadelphia, for amicus curiae United Union of Roofers, Waterproofers, and Allied Workers, etc., et al.

Jeffrey VanVoorhis Mansell, Esq., Goldberg, Persky & White, P.C., Pittsburgh, for amicus curiae United Steelworkers.

Rosalind T. Kaplan, Esq., Jarve Kaplan Granato, L.L.C., for amicus curiae American Association for Justice, et al.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## *ORDER*

PER CURIAM.

Appeal dismissed as having been improvidently granted.

Justice SAYLOR files a dissenting statement in which Chief Justice CASTILLE joins.

Justice SAYLOR, dissenting.

Appeal was allowed to consider whether, in product liability actions in Pennsylvania, to move from Section 402A of the Second Restatement of Torts to Section 2 of the Third Restatement of Torts: Product Liability, thus substantially altering the liability scheme grounded on the seminal decision in *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978). I reiterate my belief that Azzarello is severely deficient, particularly when measured against developed understanding and experience, and necessary adjustments are long overdue. Thus, I cannot support the decision to dismiss this appeal and permit another opportunity to go by the wayside.

## I. Background

This is an appeal from a verdict favorable to the plaintiff in a product liability action based on asbestos exposure litigated against a non-manufacturer distributor. Appellee and her

husband, now deceased, pursued recovery on a strict-liability, failure-to-warn theory under Section 402A of the Second Restatement. During the trial, Appellant, the defendant, sought the application of Section 2 of the Third Restatement by way of a motion *in limine,* which was denied in light of this Court's well-established precedent adopting Section 402A of the Second Restatement. The verdict was affirmed by the Superior Court, again based on this Court's settled precedent. *See Bugosh v. Allen Refractories Co.,* 932 A.2d 901, 911 (Pa.Super.2007) ("Until and unless our Supreme Court alters its approach to strict liability, we will continue to adhere to established principles.").

Nearly six years ago, the state of products liability law in Pennsylvania was discussed extensively in *Phillips v. Cricket Lighters,* 576 Pa. 644, 841 A.2d 1000 (2003) (plurality).[1] The lead opinion in *Phillips* strongly adhered to the course set by *Azzarello,* which held that, in the application of Section 402A of the Second Restatement, which imposes liability upon "[o]ne who sells any product in a defective condition unreasonably dangerous," the concept of "unreasonably dangerous" (or conversely due and reasonable safety) has no place before a jury. *See Azzarello,* 480 Pa. at 555–56 & n. 9, 391 A.2d at 1025 & n. 9. *Azzarello's* chief concern was with the protection of consumers exposed to mass marketing. *See id.* at 553, 391 A.2d at 1023–24. The Court sought to advance this aim in actions litigated under Section 402A by broadly couching manufacturers as guarantors of their products' safety, and by strictly forbidding consideration by jurors of reasonableness conceptions. *See id.* at 559, 391 A.2d at 1027.

Echoing *Azzarello,* the *Phillips* lead reiterated that "strict liability affords no latitude for the utilization of foreseeability concepts" grounded in negligence theory. *Id.* at 655, 841 A.2d at 1006 (citing *Lewis v. Coffing Hoist Div., Duff-Norton Co.,*

---

1. The subject of the underlying action in *Phillips* was harm caused by a fire originated by a child playing with a cigarette lighter. The specific question before this Court was whether the intended-use doctrine associated with strict product liability encompassed reasonably foreseeable uses. The Court's treatment of this issue subsumed foundational issues, discussed below.

515 Pa. 334, 341, 528 A.2d 590, 593 (1987) ("[N]egligence concepts have no place in a case based on strict liability.")). This is so, the lead Justices explained, because in a strict-liability action the product itself is on trial, and not the manufacturer's conduct. *Id.* (citing *Kimco Dev. Corp. v. Michael D's Carpet Outlets*, 536 Pa. 1, 7, 637 A.2d 603, 605–06 (1993), and *Spino v. John S. Tilley Ladder Co.*, 548 Pa. 286, 292, 696 A.2d 1169, 1172 (1997)). Nevertheless, the lead opinion confessed error on the part of the Court in its own use of negligence concepts within the strict-liability arena. *Id.* at 655–56, 841 A.2d at 1006–07 ("While we have remained steadfast in our proclamations that negligence concepts should not be imported into strict liability law, we have muddied the waters at times with the careless use of negligence terms in the strict liability arena." (footnote omitted)).[2] After indicating it would be imprudent to reverse all strict-liability decisions utilizing negligence terms, the lead opinion stated, "we can, and do, reaffirm that in this jurisdiction, negligence concepts have no place in strict liability law." *Phillips*, 576 Pa. at 656, 841 A.2d at 1007.

In concurrence, three Justices noted the incongruity in abiding the numerous accretions of negligence theory into strict-liability doctrine, while at the same time pronouncing they have no place there. *Phillips*, 576 Pa. at 664, 841 A.2d at 1012 (Saylor, J., joined by Castille, J., and Eakin, J.). Furthermore, it was noted, strict-liability theory at its core, as it has been applied in Pennsylvania, incorporates the principle of risk-utility (or cost-benefit) balancing, derived from negligence theory. *See id.* at 667–68 & n. 5, 841 A.2d at 1013–14 & n. 5 (citing, *inter alia, Surace v. Caterpillar, Inc.,* 111 F.3d 1039, 1044–45 (3d Cir.1997) (recognizing the "long hegemony" of cost-benefit analysis under Pennsylvania law)).[3] The concur-

---

**2.** As an example, the *Phillips* lead referenced *Davis v. Berwind Corp.,* 547 Pa. 260, 267, 690 A.2d 186, 190 (1997) (incorporating a foreseeability test into the product alteration scenario as applied within strict-liability theory).

**3.** The *Phillips* concurrence highlighted that it was never the intention of the Second Restatement to render manufacturers insurers of their products, responsible for any and all harm caused from their use,

rence also developed that, in design-defect cases,[4] the distinction between the character of a product and the conduct of the manufacturer in designing it is tenuous. *See id.* at 669, 841 A.2d at 1015 ("[M]anufacturers consciously choose how to design their products. Asking whether the product is reasonable tends to circle back to asking whether the manufacturer used due care in designing it." (quoting Richard L. Cupp, Jr. and Danielle Polage, *The Rhetoric of Strict Products Liability Versus Negligence: An Empirical Analysis,* 77 N.Y.U.L. REV. 874, 893 (2002))). The concurrence explained that Pennsylvania's attempt to isolate strict-liability theory in its entirety from negligence theory: was not supported by the author of the seminal article on which the Court had relied, *see Phillips,* 576 Pa. at 666, 670, 841 A.2d at 1014–15;[5] has led to risk-utility balancing by trial courts on facts most favorable to the plaintiff (to avoid entangling the trial judge in determining factual questions assigned to the jury under *Azzarello*); and has yielded minimalistic jury instructions (to insulate the jury from negligence terminology) which lack essential guidance concerning the key conception of product defect. *See id.* at 672–74, 841 A.2d at 1017–18.

The concurring Justices found that the Third Restatement approach illuminates the most viable route to providing essential clarification and remediation, by: preserving traditional strict liability for manufacturing defects; endorsing a reasonableness-based, risk-utility balancing test as the standard for adjudging the defectiveness of product designs; and relegating the cost-benefit analysis to the jury, guided by appropriate

---

regardless of the products' utility and relative safety. *See Phillips,* 576 Pa. at 667, 841 A.2d at 1013 (citing *Azzarello,* 480 Pa. at 555, 391 A.2d at 1025). Thus, the negligence-based risk-utility test was utilized to impose an appropriate limitation on liability. *See id.*

4. The discussion in *Phillips* centered on design-defect cases, given that liability was pursued in the underlying action via that theory.

5. Indeed, Dean John W. Wade of Vanderbilt University emphasized that, in his discussions, the strict-liability dynamic pertained to the plaintiff's burden of establishing due care in the manufacture/supply process; whereas, concepts derived from negligence theory serve a critical role at other stages (or in other aspects) of the liability assessment. *See id.*

instructions (where sufficient evidence has been presented to preclude summary judgment or a directed verdict). *See Phillips,* 576 Pa. at 675–79, 841 A.2d at 1019–21; *see also DGS v. United States Mineral Prods. Co.,* 587 Pa. 236, 254, 898 A.2d 590, 601 (2006) (referencing the position of the *Phillips* concurrence, given its conclusion that there are substantial deficiencies in present strict-liability doctrine, "it should be closely limited pending an overhaul by the Court").

Presently, Appellant aligns its primary argument with the *Phillips* concurrence, contending that, in light of its rational grounding in the context of manufacturing defects, strict liability has been "stretched beyond reason" in the way it has been extended to design-defect and failure-to-warn cases. In addition to the *Phillips* concurrence, Appellant discusses the thoughts of other judges, scholars, and commentators who, over the past thirty years, have addressed the conceptual difficulties which have surfaced as a result of the way Section 402A has been interpreted and applied. Such discourse, Appellant notes, motivated the recommendations advanced in the Third Restatement. Appellant contends that the changes advocated in the Third Restatement do not mark a radical departure from Section 402A, but rather, "fine tune" existing strict liability law to achieve greater fairness in these distinct types of claims. According to Appellant, whereas the Second Restatement is silent regarding when a product is defective, the Third Restatement provides appropriate guidance. Appellant suggests that the Third Restatement reflects the trend in product liability litigation nationwide, would clarify and streamline the law in Pennsylvania, and would result in a more just and cost-effective resolution of product liability lawsuits.

One of Appellant's *amici,* the Products Liability Council, puts the argument more bluntly, as follows:

*Azzarello* was in tatters when the Court decided *Phillips.* The three concurring Justices in *Phillips* recognized that the *Azzarello* negligence/strict liability dichotomy is beset by "pervasive ambiguities and inconsistencies." Although attempting to retain *Azzarello,* even the lead opinion in *Phillips* had to admit how murky the dichotomy had be-

come. Judicial resort to such negligence concepts in strict liability cases was so widespread that the lead opinion concluded "it would be imprudent for us to wholesale reverse all strict liability decisions which utilize negligence terms." These cases are indeed legion. While overruling them all would surely be "imprudent," *Phillips* left their status fundamentally uncertain. Are these prior precedents employing negligence principles still viable, or not? Should they be followed, ignored, or modified in some unstated way?

\* \* \*

By offering lower courts no guidance on how to treat the dozens of cases employing "reasonableness" and "foreseeability" standards in so-called "strict liability," *General Services* and *Phillips* have left core principles of Pennsylvania product liability law profoundly unsettled. Where as here "the practical application of [a] doctrine has become enigmatic," and there exists "a lack of consistency in the lower courts"—"[t]his indicates to us that the application of the [doctrine] has proved to be unworkable." *Jacobs v. Halloran*, 551 Pa. 350, 358, 710 A.2d 1098, 1102–03 (1998). When fine lines drawn between related doctrines give rise to a "labyrinth of formal distinctions" and to the "unnecessary befuddlement of [ ] simple legal proposition[s]," it is time to seek another way. *Gilbert v. Korvette, Inc.*, 457 Pa. 602, 609, 611, 327 A.2d 94, 99 (1974).

\* \* \*

Thirty years after *Azzarello*, the relationship of negligence and strict liability in product liability litigation is rife with confusion, obscure notions, and legalistic distinctions that do "not ... comport with common experience and understanding," and which fully justify "overrul[ing] that decision." *Banks Eng'g Co. v. Polons*, 561 Pa. 638, 643, 752 A.2d 883, 886 (2000).

Brief for *Amicus* Product Liability Advisory Council, Inc., at 28–29, 32–34 (citations and footnote omitted); *see also id.* at 41

("Adoption of the Third Restatement's single, unitary defect standard is needed to eliminate the current doctrinal confusion, and to create a system where juries receive adequate instructions and are not confused by redundant theories of liability.").

Appellee, on the other hand, contends that, particularly given the long-standing tenure of *Azzarello,* any modifications constitute policy making which is more properly left to the Legislature. *Accord Program Admin. Servs., Inc. v. Dauphin County Gen. Auth.,* 593 Pa. 184, 192, 928 A.2d 1013, 1017–18 (2007) ("[I]t is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations."); *Naylor v. Township of Hellam,* 565 Pa. 397, 408, 773 A.2d 770, 777 (2001) (recognizing the Legislature's superior ability to examine social policy issues and determine legal standards so as to balance competing concerns).

On the merits concerning whether to adopt the Third Restatement position, Appellee does not specifically refer to the concerns of the concurring Justices in *Phillips.* Rather, Appellee criticizes the Restatement as an inappropriate attempt at tort reform orchestrated by members of the business and insurance communities. *See* Brief for Appellee at 24 ("[T]he Restatement was heavily influenced by, if not the product of, insurance, business, and manufacturing interests."). Appellee invokes the doctrine of *stare decisis* and contends that any decision folding a Restatement section into a state's common law must be a natural development of the existing law. While recognizing in the abstract that many significant legal issues with respect to the direction of Pennsylvania's law of product liability exist, Appellee urges that this Court should not "cede the discussion" to a private organization such as the American Law Institute. *See id.* at 27 (citing Marshall S. Shapo, *In Search of the Law of Products Liability: The ALI Restatement Project,* 48 VAND. L.REV. 631, 685–86 (1995) ("To put the point more baldly, the ALI should not undertake to make law for judges.")). According to Appellee, although wide acceptance may be claimed, the Third Restatement position draws

support from the common law of only a few states. *See* Brief for Appellee at 25 (citing John F. Vargo, *The Emperor's New Clothes: The American Law Institute Adorns a "New Cloth" for Section 402A Products Liability Design Defects—A Survey of the States Reveals a Different Weave*, 26 U. MEM. L.REV. 493, 536–37 (1996)).

Appellee's brief places strong focus on the public policy concern of protecting innocent consumers, which motivated Section 402A and *Azzarello*. Appellee notes that Pennsylvania's law of product liability is deeply rooted in the concept that the manufacturer who places a product in the commercial stream is in a better position than the consumer to take steps to reduce the risk of injury from its product, or to bear the costs of injuries that do result from the use of its product. According to Appellee, a return to a fault-based system would undermine such purposes by increasing the plaintiffs' burden of proof, perhaps to an insurmountable level. In this regard, Appellee criticizes, in particular, the Third Restatement's endorsement of a requirement that plaintiffs establish the availability of an alternative, safer design to pursue liability under a design-defect theory. *See* Restatement (Third) of Torts: Products Liability § 2(b). Appellee further opposes any consideration of industry standards or state of the art in strict product liability actions, contrary to current Pennsylvania law. *See Lewis*, 515 Pa. at 343, 528 A.2d at 594; *Carrecter v. Colson Equip. Co.*, 346 Pa.Super. 95, 103, 499 A.2d 326, 330–31 (1985). Finally, Appellee asserts that adoption of the Third Restatement would reduce the incentive to product manufacturers and suppliers to distribute safer products. *Accord Kimco*, 536 Pa. at 9, 637 A.2d at 607 (positing that the "deterrent effect of imposing strict product liability standards would be weakened were we to allow actions based upon it to be defeated, or recoveries reduced by negligence concepts. We will not countenance such a development.").

The legal community obviously has taken acute notice of the *Phillips* divide, which the present appeal was selected to finally resolve. This appeal has attracted comprehensive briefing, not only from the litigants, but also from numerous

*amici.*[6]   Given the important future interests at stake, the Court is presented with advocacy on key doctrinal questions which is extensive, impressive, and zealous.

## II.   The Merits

### A.   Revisiting Azzarello

*Phillips* amply demonstrates that the core problem in the application of prevailing Pennsylvania law lies in the insistence on maintaining a doctrinal assertion that there is no negligence in strict liability, when, functionally, the law of "strict" products liability is infused with negligence concepts.   Although this fundamental incongruity was at the heart of the dispute in *Phillips*, in the present case, none of the briefs defending current law squarely addresses it.[7]   No one has advised the Court how it is that we can go forward, in resolving the numerous unsettled issues of product liability law, predicating a just and sensible jurisprudence on rhetoric so disharmonious with actual practice.

I have respect for counsel advocating the status quo and no intention of criticizing their skill or awareness of the issues. Rather, I believe they are confronted with the same difficulty faced by this Court—a serious misalignment between the

6.   On Appellant's side, these include the Pennsylvania Defense Institute, the Product Liability Advisory Council, Inc., Pennsylvania Chamber of Business and Industry, Coalition for Litigation Justice, Inc., Chamber of Commerce of the United States of America, National Association of Manufacturers, NFIB Small Business Legal Center, National Association of Wholesaler–Distributors, American Tort Reform Association, American Insurance Association, Property and Casualty Insurers Association of America, National Association of Mutual Insurance Companies, American Chemistry Council, Washington Legal Foundation, Sherwin–Williams Company, United States Steel Corporation, Textron, Inc., and Beazer East, Inc. Appellee's *amici* are the American Association for Justice, Pennsylvania Association for Justice, Pennsylvania AFL–CIO, Local 449 Steamfitters, Local 2 Asbestos Workers, United Steelworkers, United Union of Roofers, Waterproofers and Allied Workers, Local No. 30, and International Association of Heat and Frost Insulators and Allied Trades, Local No. 14.

7.   Certainly, the briefs of Appellee and her *amici* rely on this Court's statements that negligence concepts do not belong in strict liability doctrine.   They offer little, however, to explain how this notion can be rationally squared with a strict-liability regime which, in material respects, overlaps with negligence theory.

descriptions of our strict liability doctrine and its actual operation.[8] The *Phillips* lead opinion appears to have made the best of what can be done with the situation with the following expression:

> While it would be imprudent of us to wholesale reverse all strict liability decisions which utilize negligence terms, we can, and do, reaffirm that in this jurisdiction, negligence concepts have no place in strict liability law.

*Phillips,* 576 Pa. at 656, 841 A.2d at 1007. On such a foundation, however, it is very difficult to move forward to decide the numerous unsettled issues of law connected with strict liability doctrine consistent with the core principles. Admittedly, we have cases which incorporate negligence concepts into strict liability doctrine—we will not (and cannot justly) overturn them—and so negligence concepts clearly do have a place in strict liability law. How is it, then, that we may continue to require courts and litigants to continue to say they do not?

When product liability law initially was being shaped, like this Court, many others envisioned a categorical divide between strict-liability and negligence concepts. *See, e.g., Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153, 1161 (1972). This was most readily justified in the "prototype" cases involving manufacturing defects, in which "something went wrong in the manufacturing process, so that the product had a loose screw or a defective or missing part or a deleterious element, and was not the safe product it was intended to be." John W. Wade, *On the Nature of Strict Tort Liability for Products,* 44 MISS. L.J. 825, 831–32, 837 (1973). Once the foundation for strict liability was laid, however,

---

8. *See generally* 1 MADDEN & OWEN ON PRODUCTS LIABILITY § 5:10 (3d ed.2008) (explaining that "the rhetoric of 'strictness' proved so potent and uncompromising that it hampered the reasoned evolution of the doctrine over time. The products liability law-in-practice continued to develop, but the language of the law (its doctrine) failed to keep pace."); William A. Worthington, *The "Citadel" Revisited: Strict Tort Liability and the Policy of Law,* 36 S. TEX. L.REV. 227, 240 (1995) (positing that, as a result of the courts' application of a loss-spreading rationale in the tort context, "legal analysis became contorted as courts struggled to reconcile compensation with traditional tort principles. Ultimately, the credibility of our legal system has suffered.").

claims involving two other categories of defects, design and warning defects, proliferated. As the treatment of these broader categories evolved, most courts came to realize that application of strict liability in design and warning cases was far more problematic than in the manufacturing-defect paradigm. Particularly in light of the tort system's largely open-ended damages scheme, and the impossibility of designing products incapable of contributing to human injury, doctrinal limiting principles were necessary to contain the liability of product manufacturers and suppliers. *See, e.g., Prentis v. Yale Mfr'g Co.*, 421 Mich. 670, 365 N.W.2d 176, 181–82 (Mich. 1984).[9] The alternative, it was widely recognized, was to sanction what would be, effectively, a scheme of mandatory insurance imposed by the judiciary on the business community, an idea foreign to the judicial function and unpalatable in any jurisdiction.[10] In furtherance of establishing essential

9. *See generally* David G. Owen, *Design Defects*, 73 Mo. L.Rev. 291, 353 (2008) ("In holding manufacturers responsible for defects in design, courts and commentators have always sought to avoid absolute liability, recognizing that the concepts of design safety and design danger are matters of degree involving trade-offs between a product's usefulness, cost, and safety."); *id.* at 299 ("As the strict manufacturer liability principles of ... Restatement (Second) of Torts § 402A spread across the nation in the 1960s and 1970s, courts and commentators searched mightily for standards or 'tests' of liability that would stop liability well short of absolute.").

Various social policy and pragmatic justifications for limiting the liability of manufacturers include: incentivizing safer design by rewarding careful manufacturers; the recognition that a verdict for a plaintiff in a product liability case is tantamount to a determination that an entire product line is defective, and therefore, the higher threshold of fault is justified; a fault system incorporates greater intrinsic fairness by not burdening manufacturers and their customers with the cost of insuring against all possible losses; and liberalized modern discovery rules should enable plaintiffs to learn the facts surrounding manufacturers' deliberate design decisions. *See Prentis*, 365 N.W.2d at 185.

10. This Court previously has eschewed the notion of a pure loss spreading tort system. *See, e.g., Cafazzo v. Central Med. Health Servs., Inc.*, 542 Pa. 526, 535, 668 A.2d 521, 526 (1995) ("To assign liability for no reason other than the ability to pay damages is inconsistent with our jurisprudence."); *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 217, 584 A.2d 1383, 1387 (1991) (finding "[r]eliance on cost-shifting as the only factor to be considered in whether a given party should be exposed

boundaries and reconciling strict liability doctrine with the historical grounding of tort law in notions of corrective justice, risk-utility balancing—an approach derived from negligence theory—attained wide-scale recognition as a rational limiting principle. *See Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 539–41 (3d Cir.2007); *Prentis*, 365 N.W.2d at 183.[11]

In its effort to justify curtailing the application of negligence-based principles in Pennsylvania's strict product liability regime, *Azzarello* relied on two judicial decisions—the California Supreme Court's seminal opinion in *Cronin* and a New Jersey court's decision in *Glass v. Ford Motor Co.*, 123 N.J.Super. 599, 304 A.2d 562 (1973). *Azzarello* did not recognize, however, that *Cronin* already was widely criticized as providing no useful definition of the central concept of product defect in design-defect cases. *See, e.g., Cepeda v. Cumberland Eng'g Co.*, 76 N.J. 152, 386 A.2d 816, 826 (1978) (citing Wade,

to liability" insufficient to support liability because it "would result in absolute liability rather than strict liability").

11. Countering the loss-spreading rationale, courts and commentators came to recognize the impact on business of an expanded liability scheme grounded on such principle. For example, one commentator indicated:

> Between 1971 and 1976, the cost of product liability insurance premiums increased drastically. According to 1984 Department of Commerce statistics, America's foreign competitors had insurance costs twenty to fifty times lower than their American counterparts. . . .
> Not only is insurance unobtainable for many manufacturers, the tort system is not an effective insurance delivery mechanism. A study by the Rand Corporation's Institute for Civil Justice found that the legal system incurred a total transaction cost of $16 to $19 billion to deliver $14 to $16 billion of net compensation to plaintiffs. According to Professor George L. Priest of Yale University School of Law, the result of the expanded tort liability has been to "shift insurance delivery to a third-party mechanism." He views such a system as inefficient. It provides insurance in excess of consumer demand, and the administrative burden is approximately 2.75 to 5.75 times greater than a first-party delivery system.

Worthington, *The "Citadel" Revisited*, 36 S. Tex. L.Rev. at 250–52 (citations omitted). The point here is not to accept or adopt these particular assertions. Rather, my aim is merely to recognize the difficulty of the judiciary maintaining a loss-spreading scheme detached from fault without seriously considering the empirical validity of underlying assumptions about the societal impact of the scheme.

*On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. at 834–35, 837; W. Page Keeton, *Product Liability And The Meaning Of Defect*, 5 St. Mary's L.J. 30, 37–38 (1973)), *overruled on other grounds and modified in Suter v. San Angelo Foundry & Machine Co.*, 81 N.J. 150, 406 A.2d 140, 148, 153 (1979), *superseded in part by* 2A N.J. Stat., Ch. 58C. Indeed, *Cronin* was curtailed by the California high court soon after its issuance, based on the recognition that "it is simply impossible to eliminate the balancing or weighing of competing considerations in determining whether a product is defectively designed or not." *Barker v. Lull Eng'g Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443, 456 (1978). Thus, the court expanded on *Cronin* in an effort to give content to the concept of defect and permit risk-utility balancing by jurors. *See id.* at 456–57.[12]

Further, in the ensuing decades, the California Supreme Court has "repeatedly held that strict products liability law in California may incorporate negligence concepts without undermining the principles fundamental to a strict liability claim." *Johnson v. American Standard, Inc.*, 43 Cal.4th 56, 74 Cal. Rptr.3d 108, 179 P.3d 905, 916 (2008). Again, this is the tribunal that pioneered strict liability under Section 402A and was the central source of authority referenced in *Azzarello* for the proposition that negligence concepts have no place in strict-liability theory. *See Azzarello*, 480 Pa. at 555, 391 A.2d at 1025 (quoting *Cronin*, 501 P.2d at 1161).

The only other judicial decision upon which *Azzarello* relied in eschewing negligence concepts is *Glass*. *See Azzarello*, 480 Pa. at 555–56, 391 A.2d at 1025. There, a New Jersey court held that the unreasonably-dangerous element had no valid place in strict-liability doctrine based on the rationale that "[t]he notions of negligence and of strict liability .... are antithetical to each other." *See Glass*, 304 A.2d at 564. *Azzarello* failed to recognize, however, that *Glass* already had

12. The single reference to this Court's *Azzarello* decision in California case law appears in a dissenting opinion in *Finn v. G.D. Searle & Co.*, 35 Cal.3d 691, 200 Cal.Rptr. 870, 677 P.2d 1147 (1984), in which Chief Justice Bird dismissed *Azzarello's* approach as "extremely vague and ... difficult to follow." *Id.* at 1168 n. 17 (Bird, C.J., dissenting).

been disapproved, in relevant part, by the New Jersey Supreme Court. *See Cepeda,* 386 A.2d at 829 (explaining that "[t]he Restatement criterion of 'unreasonably dangerous' remains soundly applicable" to design defect claims and disapproving *Glass* to the extent it held to the contrary).

An accurate account of New Jersey's then-prevailing approach to strict liability would encompass the New Jersey Supreme Court's acute understanding of the criticisms *Cronin* had generated. *See Cepeda,* 386 A.2d at 829 ("As stated by Dean Keeton ..., 'the difficulty is that no content was given (by Cronin) to the concept of defect and this is vitally important when a plaintiff's theory is that a product, although fabricated and constructed as it was intended to be, subjected users or others to an inherent risk of harm that made the product defective.'" (quoting Keeton, *Product Liability and the Meaning of Defect,* 5 ST. MARY'S L.J. at 30–32)). *Cepeda* also recognized, fundamentally, that "'demanding that the defect render the product *unreasonably* dangerous reflects a realization that many products have both utility and danger.'" *Id.* at 826 (quoting, indirectly, *Ross v. Up–Right, Inc.,* 402 F.2d 943, 946 (5th Cir.1968) (emphasis added)). For this reason, the court accepted the critical distinction between manufacturing and design defects, as well as the necessary role of the unreasonably dangerous requirement in the liability scheme, explaining:

> The heart of the approach we take toward resolution of the matter of defendant's affirmative liability in this case calls for a careful distinction between ordinary manufacturing defects and defects of design.
>
> * * *
>
> [T]he point to be made is that in design defect liability analysis the Section 402A criterion of "unreasonably dangerous" is an appropriate one if understood to render the liability of the manufacturer substantially coordinate with liability on negligence principles. The only qualification is as to the requisite of foreseeability by the manufacturer of the dangerous propensity of the chattel manifested at the

trial this being imputed to the manufacturer. "Since the proper design is a matter of reasonable fitness, the strict liability adds little or nothing to negligence on the part of the manufacturer."

*Cepeda*, 386 A.2d at 824–25 (citing, *inter alia*, W.L. PROSSER, TORTS 659 n. 72 (1971)).[13]

Whereas *Glass* had attempted to remove the "unreasonably dangerous" criterion from the Section 402A analysis, the *Cepeda* court placed the matter squarely before New Jersey juries by approving an instruction requiring a determination that a product is in a "defective condition unreasonably dangerous." *Cepeda*, 386 A.2d at 827, 829 ("It will suffice for purposes of the case at bar, which is clearly a situation of alleged design defect, that the Restatement criterion of 'unreasonably dangerous' remains soundly applicable thereto. To the extent that the decision in [*Glass* ] may be read to the contrary, it is herewith disapproved.").[14] *Azzarello* was remiss

13. After *Azzarello's* issuance, in *Suter* the New Jersey Supreme Court indicated the jury should be charged "in terms of whether the product was reasonably fit, suitable and safe for its intended and foreseeable purposes...." *Suter*, 406 A.2d at 153. Both the "unreasonably dangerous" and "due safety" formulations specifically had been rejected by *Azzarello* in terms of jury instructions. *See Azzarello*, 480 Pa. at 555–56, n. 9, 391 A.2d at 1025 & n. 9.

14. *See generally* 1 MADDEN & OWEN ON PRODUCTS LIABILITY § 2:10 ("[A]s courts applied the new 'strict' liability doctrine to product manufacturers and other defendants in an increasing array of contexts, many courts and legislatures began to recognize that liability for the manufacture and sale of products containing design and warning defects is best defined in terms of the principles of negligence law, centered on the balance of foreseeable risk, cost, utility, reasonableness, and optimality.").

The New Jersey Supreme Court later experimented further with more absolute forms of strict liability, *see Beshada v. Johns–Manville Prod. Corp.*, 90 N.J. 191, 447 A.2d 539, 549 (1982), but it retreated in *Feldman v. Lederle Laboratories*, 97 N.J. 429, 479 A.2d 374, 388 (1984) (limiting *Beshada* to its facts). *See generally* David G. Owen, *The Evolution of Products Liability Law*, 26 REV. LITIG 955, 979 (2007) (indicating that "the significance of *Feldman* and [the California Supreme Court's decision in *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988),] in the development of modern American products liability law cannot be overstated. Together they represent a national rejection of the doctrine of strict manufacturer

in its failure to discuss such reasoned, developing counter-positions, particularly as they pertained to the very lines of authority upon which it was relying.[15]

In addition to these two decisions, *Azzarello* referenced scholarly commentary, principally from Dean W. Page Keeton of the University of Texas and Dean Wade. *Azzarello* did not acknowledge, however, that both scholars strongly favored a negligence-based test for "strict" liability claims, albeit stripped of any scienter requirement. *See* Owen, *Design Defects*, 73 Mo. L.REV. at 353–360 (summarizing the works of Deans Keeton and Wade before and after *Azzarello* ).[16] Moreover, while highlighting selective portions of these scholars' work, *Azzarello* summarily rejected other critical aspects. For example, Dean Wade had forcefully argued that it was necessary to use terms such as "not reasonably safe" or "not duly safe" to convey essential liability principles to jurors. *See* Wade, *Strict Tort Liability of Manufacturers*, 19 S.W.L.J. at 15; Wade, *On the Nature of Strict Tort Liability for Products*, 44 MISS. L.J. at 833. *See generally* George W. Conk, *Is There a Design Defect in the Restatement (Third) of*

liability in tort by the very two courts that had led the products liability revolution during the 1960s and 1970s.").

15.  In terms of our sister states addressing the matter prior to *Azzarello*, New Jersey was not alone in recognizing the difficulty with underweighting the reasonableness dynamic in design-defect and warnings cases. *See, e.g., Volkswagen of Am., Inc. v. Young*, 272 Md. 201, 321 A.2d 737, 747 (1974) ("Since the existence of a defective design depends upon the reasonableness of the manufacturer's action, and depends upon the degree of care which he has exercised, it is wholly illogical to speak of a defective *design* even though the manufacturer has 'exercised all possible care' in the preparation of his product."); *accord Ford Motor Co. v. Hill*, 404 So.2d 1049, 1051 (Fla.1981) (explaining that "analysis of whether a product is in a defective condition unreasonably dangerous to the user involves a negligence analysis in a 'design defect' case, unlike the analysis ordinarily required in a 'manufacturing flaw' situation").

16.  By omitting the scienter requirement, Deans Keeton and Wade were proposing that knowledge of the dangerous condition of a product be attributed to its manufacturer, regardless of whether the manufacturer knew or should have known of the danger. *See id.; see also, e.g.,* Wade, *On the Nature of Strict Tort Liability for Products*, (44 Miss. L.J. at 834–35). This adjustment aside, again, both scholars had strongly advocated a negligence-oriented scheme. *See id.*

*Torts: Products Liability?,* 109 Yale L.J. 1087, 1088 (2000) ("The 'alternative-safer-design' rule enshrined in section 2 of the Restatement (Third) is the vindication of Wade's view that design-defect litigation should turn on whether the product could have and should have been made safer before it was sold."). Yet *Azzarello* pronounced, without further explanation, that those terms "merely obscure the underlying question and serve no real purpose." *Azzarello,* 480 Pa. at 556 n. 9, 391 A.2d at 1025 n. 9.

Similarly, early on, Dean William L. Prosser of the University of California–Berkeley, who was the reporter for Section 402A, observed that any analysis of a design defect rests "primarily upon a departure from proper standards of care," and that "the tort is essentially a matter of negligence" based upon a "duty to use reasonable care to design a product that is reasonably safe for its intended use, and for other uses which are foreseeably probable." W.L. Prosser, Handbook of The Law of Torts, § 96 at 641, 644–45 (4th ed.1971).

I mean no disrespect to the Justices who participated in *Azzarello;* in particular, I recognize the decision was well intentioned in following a consumer-oriented direction set by prominent judicial decisions elsewhere. Nevertheless, in light of *Azzarello's* entrenched status, and the pitch of its defense by various jurists and members of the trial bar over the past thirty years, it is necessary to develop closely its substantial shortcomings in order to lay the groundwork for moving forward.

The reality is that *Azzarello* simply was not well reasoned in its own time, and it certainly has not withstood the test of time. Its good intentions alone cannot justify its continuing longevity, particularly in light of the wealth of experience and scholarship establishing the unworkability, going forward, of its dictates as common-law tort principles. *See generally Mayhugh v. Coon,* 460 Pa. 128, 135–36, 331 A.2d 452, 456 (1975) (discussing exceptions to *stare decisis* ). As noted, the very same jurisdictions upon which *Azzarello* relied very quickly had recognized that the interests of justice required necessary and substantial adjustments to the experiment with

strict liability across the categories of manufacturing, design, and warning defects. This Court has lagged for far too long in this essential recognition, and unfortunately, the ritualistic adherence to *Azzarello* has substantially impeded the progress of our product liability jurisprudence. *See generally* 1 MADDEN & OWEN ON PROD. LIAB. § 5:10 (explaining that "the rhetoric of 'strictness' proved so potent and uncompromising that it hampered the reasoned evolution of doctrine over time.").

As Appellee notes, this Court had supplemented *Azzarello's* loss-spreading reasoning with a deterrence-based rationale. *See Kimco,* 536 Pa. at 9, 637 A.2d at 607 (positing that the "deterrent effect of imposing strict product liability standards would be weakened were we to allow actions based upon it to be defeated, or recoveries reduced by negligence concepts. We will not countenance such a development."). Like the loss-spreading rationale, however, the deterrence-based rationale is stated in too conclusory terms, and is too powerful, to be deemed controlling. Courts are not experts in manufacturer behavior, and there are equally reasonable arguments to be made that a negligence-based standard does more to encourage safer products than an absolute liability scheme. *See, e.g., Prentis,* 365 N.W.2d at 185. Moreover, courts and commentators have noted that these types of unsupported social policy judgments can have tremendous social consequences. As explained by one commentator:

> [C]hallenging a product's design challenges the decision of the manufacturer's engineers and managers to develop and sell a product containing a particular type and level of danger. Thus, unlike a manufacturing defect claim, which implicates merely a single product unit, a design defect claim challenges the integrity of the entire product line and so pierces to the very core of the manufacturer's enterprise. For this reason, design defect claims are of greatest concern to manufacturers, since a judicial declaration that the design of a particular product is "defective" condemns the entire product line.

*See* Owens, *Design Defects,* 73 Mo. L.REV. at 296; *see also Prentis,* 365 N.W.2d at 185 (explaining that "a verdict for the

plaintiff in a design defect case is the equivalent of a determination that an entire product line is defective. It usually will involve a significant portion of the manufacturer's assets and the public may be deprived of a product.").[17] In order to prevent the common law from unduly disrupting product investment and innovation,[18] rational limits are necessary, which provides one substantial explanation for most courts' retreat from more absolute forms of liability grounded on loss-spreading and deterrence-based reasoning in design and warnings cases, in favor of a return to more traditional tort theories. *Accord* Worthington, *The "Citadel" Revisited*, 36 S. Tex. L.Rev. at 269 (commenting that "courts are beginning to place limits on existing non-fault based theories, representing both a return to traditional moral principles and a pragmatic realization of the chilling effect of the strict tort liability doctrine."). *See generally Toogood v. Rogal*, 573 Pa. 245, 254, 824 A.2d 1140, 1145 (2003) (describing fault-based liability as a "traditional cornerstone" of tort law).

There is some force to Appellee's argument that, at this juncture, this Court should leave alterations to the existing product liability scheme to the General Assembly. Certainly, statutory law now occupies the field of a vast array of substantive matters, and this Court's common-law decision-making role has been substantially curtailed. Moreover, in the face of complex technological and industrial developments, modern products liability law contains many components that are interlocking, interdependent, and/or overlapping, suggesting

---

**17.** Notably, *Azzarello* and *Kimco* gave no express consideration to such potential effects.

**18.** Touching on this subject of chilling product development, in the context of a warnings case, the California Supreme Court stated as follows:

[We have] refused to extend strict liability to the failure to warn of risks that were unknowable at the time of distribution … [I]f a manufacturer could not count on limiting its liability to risks that were known or knowable at the time of manufacture or distribution, it would be discouraged from developing new and improved products for fear that later significant advances in scientific knowledge would increase its liability.

*Anderson v. Owens–Corning Fiberglas Corp.*, 53 Cal.3d 987, 281 Cal. Rptr. 528, 810 P.2d 549, 556 (1991).

against the sort of piecemeal development that is inherent in the progression of the common law.[19]

Nevertheless, to date, the Legislature has not occupied this particular arena; it is in a state of substantial disrepair occasioned by longstanding adherence to *Azzarello* and its progeny; and this path has taken our jurisprudence too far from the legitimate home of tort law in the concept of corrective justice. Thus, I believe the Court should make necessary adjustments while the possibility of comprehensive legislative treatment remains uncertain. *Cf. Hack v. Hack*, 495 Pa. 300, 316, 433 A.2d 859, 867 (1981) ("This Court has full authority, and the corresponding duty, to examine its precedents to assure that a rule previously developed is not perpetuated when the reason for the rule no longer exists and when application of the rule would cause injustice.").

In summary, the Court should no longer say negligence concepts have no place in "strict-liability" doctrine in Pennsylvania, when this simply is not accurate in our tort scheme, or in any scheme purporting to recognize that manufacturers and distributors are not outright insurers for all harm involving their products. To the degree a distinct category of "strict" product liability doctrine is necessary, at most, it always has been, and rationally should be, one of quasi-strict liability, tempered, in design and warning cases, with the legitimate involvement of notions of foreseeability and reasonableness within the purview of the fact finder.[20]

19. Our common-law decisions are grounded in records of individual cases and the advocacy by the parties shaped by those records. Unlike the legislative process, the adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion. The broader tools available to the legislative branch in making social policy judgments, including the availability of comprehensive investigations, are discussed in *Pegram v. Herdrich*, 530 U.S. 211, 221–22, 120 S.Ct. 2143, 2150, 147 L.Ed.2d 164 (2000).

20. I would credit the late, Honorable Donald E. Wieand with making an extensive case, in 1987, for adopting a standard for design cases grounded in negligence concepts, consistent with my position here. *See Foley v. Clark Equipment Co.*, 361 Pa.Super. 599, 612–26, 523 A.2d 379, 385–92 (1987).

## B. A Replacement Scheme

As highlighted in *DGS* and above, the powerful no-negligence-in-strict-liability rubric has undergirded numerous Pennsylvania decisions in the product liability arena over the last thirty years. *See DGS,* 587 Pa. at 259, 898 A.2d at 604. Thus, at the risk of understatement, a present disapproval of this premise would open a substantial void. This appeal was accepted for review to evaluate both whether that void should be opened, and, if so, whether Section 2 of the Third Restatement should be adopted outright to fill at least a portion of it.

### 1. The Third Restatement

I am on record as favoring prospective movement to the Third Restatement position, and I remain of that position today, for the reasons I previously have stated. *See Phillips,* 576 Pa. at 664–82, 841 A.2d at 1012–23. I believe the Third Restatement's provisions are far more reasoned and balanced than *Azzarello,* and adoption would represent a substantial advancement in Pennsylvania law. While Appellee is correct that we should not cede our decision making authority to commentators, the reality is that necessary modernization of the law of Pennsylvania has been suppressed for so long by the no-negligence-in-strict-liability mantra that we are essentially thirty years behind. The Restatement would serve as a far more rational platform from which to make modest future adjustments, if necessary, than *Azzarello.* As stated very recently by a panel of the United States Court of Appeals for the Third Circuit in conjunction with a prediction that this Court would adopt Sections 1 and 2 of the Third Restatement: "The Third Restatement ... eliminates much of the confusion that has resulted from attempting to quarantine negligence concepts and insulate them from strict liability claims." *Berrier v. Simplicity Mfg., Inc.,* 563 F.3d 38, 55 (3d Cir.2009). Thus, the Restatement provides a suitable template for making up for lost time and moving forward.

### 2. A Common–Law Lawmaking Alternative

To the degree a majority of the Court is not comfortable

adopting the whole of Section 2 in this case,[21] there are other alternatives to leaving *Azzarello* in place while the Court continues to search for the perfect vehicle in which to devise a replacement scheme. For example, the Court could at least depart from *Azzarello* prospectively, thus clearing a path for our common pleas and intermediate appellate courts to consider the reasoned recommendations of the Third Restatement, as well as other reasoned alternatives and/or refinements. As the cases would move through the system, this Court inevitably would make selections to fill the void created by *Azzarello's* long tenure.[22]

Undoubtedly, this approach would not be wholly satisfying to those who have long pursued a modernization of this Court's product-liability jurisprudence. It may well be, however, that the forum for timely, comprehensive solutions is with the political branch, which possesses the broader tools necessary to make better informed social policy decisions balancing the strong, competing interests involved in the product liability arena.[23]

21. The present matter is a warnings case. Thus, it would be unusual for this appeal to be employed as a vehicle to adopt a core aspect of Section 2 of the Third Restatement—the requirement of a reasonable alternative design pertaining to design—defect claims. *See* Restatement (Third) of Torts: Products Liability § 2(b). My personal position is that design matters were at issue in *Phillips*, and this case represents a necessary extension of the debate which initially crystallized there. I recognize, however, that other Justices (particularly those who did not participate in *Phillips* ) may hold a different view; thus, I have included the discussion, infra and in Appendix A, of a more modest common-law lawmaking alternative.

22. The process of developing and refining applicable duties and liabilities as a matter of common law is generally slow and cumbersome. Our trial courts, as courts of general jurisdiction, are responsible for addressing open issues in the first instance, and cases filter through the intermediate appellate courts, with review being granted by this Court on a discretionary basis, such that the opportunity is provided for careful, informed developments. In this process, the dynamics of a seven-member Court cannot be understated—at times, it is difficult enough to achieve a consensus on a single, narrow question presented.

23. Of course, even if the General Assembly were to act, this Court would maintain a substantial role in assuring conformity with constitutional limitations, and interpreting or construing the legislative will. Additionally, and unfortunately, in past instances of major social policy

If the Court were to pursue the common-law lawmaking alternative, it could initially reaffirm the understanding, as succinctly expressed by one commentator, that "[m]odern products liability law rests fundamentally on the premise that manufacturers are fairly held to answer in the courts for the basic safety of their products' designs." Owen, *Design Defects*, 73 Mo. L.Rev. at 291. Since the difficulties described above are with *Azzarello* and not Section 402A itself, Pennsylvania would remain a Section 402A jurisdiction.[24] The disapproval of *Azzarello's* no-negligence-in-strict-liability approach, however, should yield at least the non-exclusive set of consequences and considerations set forth in the addendum attached to this opinion as Appendix A.

## III. Prospective Application

The *Phillips* concurrence advocated making the foundational movement away from Section 402A on a purely prospective basis. *See Phillips*, 576 Pa. at 665, 841 A.2d at 1012 (Saylor, J., concurring). Although this Court generally applies the law in effect at the time of an appellate decision, affording parties whose cases are pending the benefit of changes in the law, *see Blackwell v. Commonwealth, State Ethics Comm'n*, 527 Pa. 172, 182, 589 A.2d 1094, 1099 (1991), it may deviate from this approach to further the interests of justice. *See id.* at 185, 589 A.2d at 1100 ("The prime impetus behind th[e] occasional willingness not to give a decision full effect is the concern that a novel decision will unfairly prejudice those formerly advan-

legislation, the Legislature has sometimes left substantial decision-making details to others (be it the judiciary or administrative agencies), making it very difficult for the courts to assess what was intended. *See, e.g., Generette v. Donegal Mut. Ins. Co.*, 598 Pa. 505, 523, n. 15, 957 A.2d 1180, 1191 n. 15 (2008) (commenting on such gaps in the Motor Vehicle Financial Responsibility Law). In such instances, in filling major policy-setting gaps based on only generalized information about the legislative intent, the courts are vulnerable to being perceived as effectively reverting to a common-law decision-making role in any event. Thus, if there ultimately is a legislative solution, a clear and comprehensive one is most desirable.

24. This is not to say that the Court would be rejecting principles arising out of the Third Restatement that are consistent with the application of Section 402A, or that it would not adopt aspects of the Third Restatement as they are presented to it in the context of concrete cases.

taged by the old rules." (quoting *Gibson v. Commonwealth,* 490 Pa. 156, 163, 415 A.2d 80, 84 (1980))).[25] Here, a predominant consideration is the settled expectations of those with

**25.** More specifically, the standard adopted by this Court considers: whether the decision establishes a new principle of law; the merits by reviewing the history of the rule in question, its purpose and effect, and the potential impact of retroactive effect on its application; and the equities involved. *See Blackwell,* 527 Pa. at 184, 589 A.2d at 1100 (citing *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971), *overruled in part by Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993)). I recognize this Court has indicated that the *Harper* decision modifying *Chevron* "strengthens the general principle that changes in law are to be applied retroactively to pending cases." *Christy v. Cranberry Volunteer Ambulance Corps, Inc.,* 579 Pa. 404, 419, 856 A.2d 43, 52 (2004). Nevertheless, this Court subsequently applied the *Chevron* factors to support a purely prospective application of a judicial decision in *Oz Gas, Ltd. v. Warren Area Sch. Dist.,* 595 Pa. 128, 142–43, 938 A.2d 274, 283–84 (2007). While *Oz Gas* entailed prospective application of decision interpreting a tax statute, I believe it illustrates that, although the instances in which purely prospective application of a judicial decision is warranted may be rare, the *Chevron* approach does maintain some independent viability in permitting prospective application of decisions involving matters of Pennsylvania law on the civil side.

It is also worth noting that *Harper's* primary concern was with the disparate impact of applying a judicial decision to the parties before the Court but not to similarly situated persons with preserved claims pending on direct appeal. *See Harper,* 509 U.S. at 97–98, 113 S.Ct. at 2517–18. The *Phillips* concurrence, however, proposed prospective application that would not extend to the parties before the Court. Moreover, it seems to me that there can be as much or more justice in directing purely prospective application of a decision overruling a longstanding, entrenched common-law doctrine impacting on vested rights as a decision resolving tax matters where the parties were forewarned that there are unsettled legal questions.

Much of the debate over the courts' ability to make law prospectively centers on the notion that courts do not actually make the law, but rather, declare what the law is. *See Smith,* 496 U.S. at 201, 110 S.Ct. at 2343 (Scalia, J., concurring) ("[P]rospective decisionmaking is incompatible with the judicial role, which is to say what the law is, not to prescribe what it shall be."). This simply is not true, however, of state common-law decision making—this Court made new law in *Azzarello,* and it will have to make new law again if it is to address *Azzarello's* shortcomings.

The Legislature makes new law prospectively, as a general rule, for very good reasons—I believe it would be poor policy to absolutely foreclose the courts from doing the same in the common-law lawmaking setting, where the interests of justice favor the approach and the constitution does not forbid it. Although it may be the rare instance in which purely prospective application is warranted, the present circumstances are, in my view, compelling and essentially sui generis.

accrued causes of action and a present entitlement to resort to the civil justice system. *Azzarello* has been with us for too long, and too much settled jurisprudence has evolved around it, for it to be retroactively displaced without profound impact on vested entitlements. *Cf. American Trucking Associations, Inc. v. Smith,* 496 U.S. 167, 200, 110 S.Ct. 2323, 2342–43, 110 L.Ed.2d 148 (1990) ("The utility of our retroactivity doctrine in cushioning the sometimes inequitable and disruptive effects of law-changing decisions is clear."). Certainly, substantial constitutional challenges would be presented to any retroactive abrogation by the Legislature.[26] Given the unique circumstances including the scale of the affected interests, I was reluctant to attempt, in *Phillips,* as a matter of common-law decision making, what our precedent suggests may be forbidden of the political branch. At least in the absence of a preserved constitutional claim asserted by a defendant or defendants, I felt that any overruling of *Azzarello* should be purely prospective.[27,28]

Appellee argues that the outcome of this case would not be affected by a movement by this Court to the Third Restate-

26. *See* PA. CONST. art. 1, § 11 ("All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial, or delay."). *See generally Ieropoli v. AC & S Corp.,* 577 Pa. 138, 155–56, 842 A.2d 919, 930 (2004) (explaining that "a cause of action that has accrued … is a vested right, which under Article 1, Section 11, may not be eliminated by subsequent legislation"); *see also Gibson,* 490 Pa. at 161, 415 A.2d at 83.

27. In this regard, I would emphasize the requirement of a preserved claim. Thus, for example, if a defendant seeks to assert a claim that its constitutional right to a jury trial was impaired by *Azzarello's* relegation of the unreasonably-dangerous requirement to a judge on facts most favorable to the plaintiff, such defendant must point to where in the record such claim was preserved. *See* Pa.R.A.P. 2119(e). Moreover, any favorable ruling on the constitutional claim would apply in other cases only to defendants who also had preserved the constitutional claim. *See Commonwealth v. Cabeza,* 503 Pa. 228, 233, 469 A.2d 146, 148 (1983) (explaining that, in both civil and criminal matters, in order for a new rule of law to apply retroactively to a case pending on direct appeal, the issue had to be preserved at "all stages of adjudication up to and including any direct appeal").

28. Of course, the above calculus may change as *Azzarello* continues to ripen, and more and more litigants are affected by its shortcomings.

ment. *See* Brief for Appellee at 8–16.[29]

This argument is obviously a potential basis supporting the present dismissal. Notably, however, a prospective application of the proposed change in the common law mitigates the concern regarding case-specific application in any event. This is so, because, under a purely prospective approach, the change in the common law would not have an impact on the outcome of any discrete case in which it would occur. Accordingly—and in view of the extensive and vigorous advocacy presented, the persistent difficulties occasioned by the *Phillips* divide, and underlying shortcomings in our present law—I believe this Court should act now to confront *Azzarello* in light of thirty years of developed understanding and experience.

### IV. Conclusion

In summary, in light of the clear deficiencies of *Azzarello* in the realm of modern products liability jurisprudence, I would overrule the decision prospectively and adopt Sections 1 and 2 of the Third Restatement in its stead, applicable to causes of action accruing after the effective date of the opinion. At the very least, I believe the Court should disavow *Azzarello* now to permit the modernization of Pennsylvania's products liability jurisprudence to progress at long last.

Justice CASTILLE joins this dissenting statement.

**29.** Appellant's arguments, as framed in its initial brief, integrally incorporate the position that the Third Restatement would relieve downstream suppliers, such as Appellant, of liability premised on the liability of upstream entities, such as the manufacturer. Appellee, however, develops that Section 2 is consistent with prevailing Pennsylvania law in imposing strict or vicarious liability on non-manufacturer distributors or suppliers. *See* Restatement (Third) of Torts: Products Liability § 2, cmt. o. Therefore, and as Appellant in its initial brief conceded the material elements of liability on the part of the manufacturing interests, *see* Brief for Appellant at 19–20, Appellee contends that application of the Third Restatement would not make a material difference to the outcome of this appeal.

## APPENDIX A

### Non-exclusive consequences and considerations resulting from an overruling of *Azzarello* without simultaneously adopting a replacement scheme

#### A. The Intended Use Doctrine

In *Phillips,* this Court adopted a very narrow approach to the intended-use doctrine, based on a combination of two Justices' application of the no-negligence-in-strict-liability rationale, *see Phillips,* 576 Pa. at 656–57, 841 A.2d at 1007, and three Justices' concern with the expansion of a doctrine based on that rationale, *see Phillips,* 576 Pa. at 674–75, 841 A.2d at 1018–19 (Saylor, J., concurring). With the demise of these underpinnings, the Court's recognition in *DGS* of the rationality of subsuming within the intended-use doctrine all reasonably foreseeable uses or occurrences, *see DGS,* 587 Pa. at 257, 898 A.2d at 603, could be realized. This, in fact, appears to be a substantial thrust of the Third Circuit's very recent *Berrier* decision. *See Berrier,* 563 F.3d at 53–58; [1] *accord Cepeda,* 386 A.2d at 828 ("It is ... clear that many, if not most jurisdictions now acknowledge that in applying strict liability in tort for design defects manufacturers cannot escape liability on grounds of misuse or abnormal use if the actual use proximate to the injury was objectively foreseeable." (citations omitted)).

#### B. Manufacturing, Design, and Warnings Defects

I would reaffirm that the differential treatment as between manufacturing, design, and warning scenarios is consistent with Section 402A.[2] Proof of negligence is dispensed with by

---

**1.** Although *Berrier's* prediction that this Court would adopt Sections 1 and 2 of the Third Restatement still may prove correct, if my position were to be adopted, it would disprove the federal court's implicit prediction that the Court would apply those sections retroactively.

**2.** *See generally* 1 MADDEN & OWEN ON PRODUCTS LIABILITY § 5:11 ("Today, most courts and commentators accept as axiomatic the fundamental distinctions between three very different forms of product defect: (1) manufacturing flaws, (2) design inadequacies, and (3) insufficient warnings of danger and instructions on safe use. Over the decades since section 402A was adopted by the ALI, the need to develop different doctrinal approaches to the problems in these three very different

most courts in applying Section 402A or similar principles in the manufacturing defect scenario, *see* Richard W. Wright, *The Principles of Product Liability*, 26 Rev. Litig. 1067, 1073 (2007), while design and warnings claims are centered on some combination of the overlapping considerations of unreasonable dangerousness, due and reasonable safety, risk-utility balancing, and/or consumer expectations. *See, e.g., Barker*, 143 Cal.Rptr. 225, 573 P.2d at 457.[3]

## C. Product and Conduct

As previously noted, the courts' attempts to distinguish product from conduct in design and warning cases have been problematic. Since the object of the distinction is to preserve an uncompromising boundary between negligence and strict liability, *see Azzarello*, 480 Pa. at 555–56, 391 A.2d at 1025–26, the justification for maintaining the difference would carry less force if such boundary were removed. Nevertheless, there are arguments to be made that, although *Azzarello* would be no more, strict liability for design-defect claims, like manufacturing-defect ones, should maintain some evidentiary advantage for plaintiffs, perhaps along the line of the Wade–Keeton test. *See supra* (main text) note 16.[4] On a similar score, Appellee's *amicus*, United Steelworkers, presents the following argument refuting the *Phillips* concurrence's accep-

contexts has become a well-accepted premise of products liability law.").

3. Courts and commentators have frequently commented that product-liability warnings claims most quintessentially incorporate negligence principles. *See, e.g., Smith v. Walter C. Best, Inc.*, 927 F.2d 736, 741–42 (3d Cir.1990) (referencing the conclusion of Deans Prosser and Keeton, that "[a]lthough [strict liability for failure to warn] is sometimes referred to as strict liability, it really is nothing more than a ground of negligence liability" (citing W.L. Prosser and W.L. Keeton, Torts § 99, at 697 (5th ed.1984))); 1 Madden & Owen on Products Liability § 2:10 ("Courts have most forthrightly admitted the central role of negligence principles in 'strict' liability claims in the context of the duty to warn.").

4. Notably, the Third Restatement does provide for an inference that harm sustained by the plaintiff was caused by a product defect where the incident was of a kind that ordinarily occurs as a result of product defect and was not solely the result of another cause. *See* Restatement (Third) § 3.

tance of the notion that product design and conduct (the design process) should be treated as one in the same, in design cases, for purposes of the liability determination:

> It is perhaps true that *usually* an unreasonably dangerous design will result from unreasonable conduct on the part of the designer. However, to state this relationship as being inescapable is to ignore the scenario in which a designer might be excusably unaware of the circumstances that make a product dangerous, but nonetheless allowed the dangers to exist in the product. Furthermore, the passage of time attendant to many products liability cases means that evidence cannot be obtained through normal discovery procedures, and therefore evidentiary standards preclude even an inexcusably unaware designer from being found liable for defects. The rule embodied in 402A therefore imposes a standard that allows a product to be considered defective in a situation where a product would have been altered or withdrawn from the market if only the designer had known of its dangerous propensities.

> \* \* \*

> It is inevitable that cases will arise involving defective products that have caused an injury, but where no fault can be proved on the part of a defendant. Such cases highlight the need for a regime which properly places the risk of lost evidence on the part of the party in the best position to both realize the utility of the product (through the prices of the products and the income generated thereby) and to know of the product[']s dangerous propensities. The manufacturer and seller have more reason to know of dangers than the consumer, whose primary sources of information on the product are manufacturers and sellers. For these reasons, strict liability embodied in 402A is the optimal regime and should be retained.

Brief of *Amicus* United Steelworkers at 10–11.

It appears that a fair number, if not most, courts considering the unknowable danger paradigm have refused to allocate

the risk of loss to the manufacturer, based upon the conclusion that doing so would render the manufacturer an insurer. *Cf. Anderson v. Owens–Corning Fiberglas Corp.*, 53 Cal.3d 987, 281 Cal.Rptr. 528, 810 P.2d 549, 559 (1991) (authorizing the admission of state-of-the-art evidence in product liability warnings cases).[5] Nevertheless, the Court could reserve decision on the matter for an appropriate case, upon more targeted advocacy by the parties at large.

## D. Judge and Jury

The overruling of *Azzarello* would place the "unreasonable dangerousness" factor, in one form or another, back into the fact finder's calculus,[6] and our trial judges' function of risk-utility balancing on facts most favorable to the plaintiff would be limited to the ordinary determination of whether there are material facts in issue for submission to a jury. *Accord* Owen, *Design Defects*, 73 Mo. L.Rev. at 332 ("The cost-benefit approach for evaluating proposed alternative designs may be logical and straight-forward, but the actual process of balancing the variety of intangible considerations involved in safety, cost, and utility trade-offs involves a complex conceptual balance which is as much political as it is 'factual.' Accordingly, the risk-utility balance determination, assuming the plaintiff has offered credible evidence for an alternative balance, almost always raises an issue of fact for jury determination.").

## E. Risk–Utility and Consumer Expectations

The difficult issue of giving appropriate content to the interrelated concepts of "unreasonable dangerousness" and

5. *See generally* Owen, *Design Defects*, 73 Mo. L.Rev. at 360 ("The ghost of the Wade–Keeton test continues to haunt judicial halls, but its time has come and gone."); *Leibowitz v. Ortho Pharmaceutical Corp.*, 224 Pa.Super. 418, 433, 307 A.2d 449, 458 (1973) (positing that holding manufacturers liable for unknowable dangers would make them insurers).

6. Although it is not universally accepted, there are fair arguments to be made in favor of Dean Wade's preference for the "due or reasonable safety" formulation in a jury charge. *See, e.g., Suter*, 406 A.2d at 153. Overruling *Azzarello* would overturn its summary rejection of such alternative formulations.

"defect" remains. The central problem with *Azzarello* is that it removed the former from the fact-finder's purview entirely and gave insufficient content to the latter.

The two primary vehicles for adding the necessary content are the consumer expectations test and risk-utility balancing.[7] A wealth of diverse judicial opinions and commentary are devoted to discussing the role of risk-utility balancing and consumer expectations in design-defect cases. *See, e.g.,* Owen, *Design Defects,* 73 Mo. L.Rev. at 300–21. In Pennsylvania, at least under suggested jury instructions, the fact finder would learn of neither, but rather, would be advised, per *Azzarello,* that "[t]he product must be provided with every element necessary to make it safe for its intended use, and without any condition that makes it unsafe for its intended use." PBI, PA. SUGGESTED STANDARD JURY INSTRUCTIONS § 8.02 (3d ed.2005). A present determination that such instruction is insufficient would open the way for a full inquiry into the appropriate roles for risk-utility balancing and consumer expectations in directing the fact finder. Thus, we would have essentially come to the place in the inquiry where other courts stood in the late 1970s.

The present baseline in Pennsylvania is risk-utility balancing. This much was accepted by *Azzarello,* although its

7. The consumer expectations test as such was derived from Comment i to Section 402A. *See* Restatement Second § 402A, cmt. i ("The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."). Some commentators have noted that comment i appears to focus on the consumption of food and drug products. *See* David G. Owen, *The Puzzle of Comments,* 55 HASTINGS L.J. 1377, 1382 (2004) ("A close reading of comments i, j, and k to the Restatement (Second) of Torts section 402A, together with their 'legislative history,' reveals that these comments were directed exclusively to a narrow set of issues pertinent to a limited class of products, to wit, the liability (and limits of liability) of sellers of certain types of products—food, whiskey, cigarettes, drugs, and similar products that carry unavoidable dangers."). Comment i, however, also is read much more broadly by various courts and commentators. *See generally Lester v. Magic Chef, Inc.,* 230 Kan. 643, 641 P.2d 353, 359 (1982) (observing that "[v]olumes have been written about the language of Comment i to § 402A").

attempt to relegate the task to the trial judge on facts most favorable to one party was misguided. Most courts recognize that consumer expectations also should play a role, but early attempts to afford it a predominant one were generally unsuccessful, and the remaining debate generally is between a relatively limited role as part of the consumer expectations test, *see, e.g.,* Restatement (Third) of Torts: Products Liability § 2, cmt. h, and a more significant role as a broader inquiry, more independent of risk-utility balancing. *See, e.g., Mikolajczyk v. Ford Motor Co.,* 231 Ill.2d 516, 327 Ill.Dec. 1, 901 N.E.2d 329, 352–53 (2008); *Soule v. General Motors Corp.,* 8 Cal.4th 548, 34 Cal.Rptr.2d 607, 882 P.2d 298, 305–08 (1994) (reasoning that, under California law, plaintiffs may recover if they establish a product either falls below consumer expectation as to safety or, if it meets ordinary consumer expectations, the fact-finder determines the product's design yields excessive preventable danger).[8] *See generally* Owen, *Design Defects,* 73 Mo. L.Rev. at 352–53 ("As cost-benefit analysis gathers strength around the globe as the dominant method for judging whether a product's design is adequately safe, courts and legislatures continue to search for ways to accommodate consumer expectations without banishing it altogether from design defect determinations."). The appropriate juxtaposition of risk-utility balancing and consumer expectations in design cases would be an issue which would need to be resolved, in Pennsylvania, as a matter of common-law decision-making.

In terms of the risk-utility balancing aspect, some adjustments would need to be made to the Wade factors commonly applied in design cases. *See generally* Owen, 73 Mo. L.Rev. at 321 (observing that "modern courts rarely do little more than pay lip service to the Wade factors, which are now well past their prime"). The object is obviously to capture the dynamics of reasonable design considerations in a fashion that is accessible to lay jurors, yet as succinct as possible. The

---

8. *Soule* appears to have effected a dilution in California's consumer expectation test, as discussed in *Todd v. Societe Bic, S.A.,* 21 F.3d 1402, 1409 (7th Cir.1994).

common-law process would also determine the appropriate focus of risk-utility balancing by a fact-finder, which the Third Restatement and numerous commentators, at least, would center on a concomitant requirement of proof of a reasonable, alternative design. *See, e.g., id.* at 327 ("Although the risk-utility issue in design defect cases is frequently framed vaguely in terms of a balance between the risks and benefits of the 'product,' the true cost-benefit issue litigated in almost every case is much narrower—whether the safety benefits of altering the product's design in a particular manner would foreseeably have exceeded the cost of the alteration. Risk-utility analysis is focused, in other words, on the costs and benefits of the specific alternative design feature proposed by the plaintiff.").[9] Again, there are numerous models available to our common pleas judges, which would be charged with the first-level, common-law selection decisions in a post-*Azzarello* era.

### F. Principles Constructed from *Azzarello*

Another clear consequence of a decision overruling *Azzarello* is that other subsidiary principles resting on the no-negligence-in-strict-liability premise should be open for fresh review. Two that come readily to mind are the Pennsylvania courts' rejection of the comparative negligence principles and the state-of-the-art defense in design cases, both of which rest, essentially, on *Azzarello*. *See Kimco*, 536 Pa. at 7, 637 A.2d at 605–06 (comparative negligence); *Carrecter*, 346 Pa.Super. at 103, 499 A.2d at 330–31 (state of the art); *cf. Lewis*, 515 Pa.

9. Dean Wade's reluctance to put a full panoply of risk-utility factors before lay jurors may well be justified, but the reality is that, in design cases, jurors will be charged with the duty to make an informed evaluation concerning design reasonableness, and the trial courts will be responsible to provide the jurors sufficient guidance to accomplish this task. *Cf.* George W. Conk, *Compared to What? Instructing the Jury on Product Defect under the Products Liability Act and the Restatement (Third) of Torts*, 30 SETON HALL L.REV. 273, 277 (1999) (positing that "[t]he quality of decisions will be better served if jury instructions invite the presentation of evidence and spur arguments that evoke the full vibrancy of the moment of design for the jury (and the court it assists). The clamor of the competing considerations in the good and prudent designer's mind should be heard in the courtroom and in the jury room.").

at 343, 528 A.2d at 594 (industry standards).[10]  Again, I would not decide these matters here in the absence of material relevance and focused advocacy; I merely note that, shorn of their groundings in *Azzarello's* rationale, such matters should be revisited.  The principles could be reaffirmed if there is other persuasive rationale to support them.

---

**10.**  These rulings appear to work against the modern trend in other jurisdictions.  *See, e.g., Webb v. Navistar Int'l Transp. Corp.,* 166 Vt. 119, 692 A.2d 343, 348 (1996) ("Most courts reject the framework that places the burden of loss on one party where two parties contributed to causing the injury."); Am. L. Prod Liab. 3d § 40:37 (2008) ("Most jurisdictions that have adopted the doctrine of comparative negligence or fault apply comparative fault principles to strict liability actions.").